**RECORD NO.**

# 22-659

In The

# United States Court of Appeals

For The Second Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## CRISTAL STARLING,

*Claimant – Appellant*,

## $8,040.00 UNITED STATES CURRENCY,

*Defendant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK (ROCHESTER)

───────────

## BRIEF OF APPELLANT

───────────

Robert E. Johnson
**INSTITUTE FOR JUSTICE**
**16781 Chagrin Boulevard, #256**
**Shaker Heights, Ohio 44120**
**(703) 682-9320**

Seth M. Young
**INSTITUTE FOR JUSTICE**
**901 North Glebe Road, Suite 900**
**Arlington, Virginia 22203**
**(703) 682-9320**

*Counsel for Appellant*

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .......................................................3

STATEMENT OF THE ISSUES............................................................5

STATEMENT OF THE CASE ...............................................................5

A.    Civil Forfeiture Generally .........................................................6

B.    The Seizure of Cristal Starling's $8,040 ...................................10

C.    The Administrative Forfeiture Proceedings ...............................11

D.    The Judicial Forfeiture Action...................................................12

E.    The Default Judgment Against Cristal's Cash ...........................16

SUMMARY OF THE ARGUMENT .....................................................18

STANDARD OF REVIEW ....................................................................21

ARGUMENT ..........................................................................................22

I.    The district court erred by analyzing the case under the
      "excusable neglect" standard, rather than the more lenient
      "good cause" standard .................................................................22

      A.    Under ordinary procedural rules, this case should have
            been analyzed under the "good cause" standard .................23

      B.    Nothing about the civil forfeiture context requires a
            departure from the ordinary "good cause" standard ..........26

      C.    Under the "good cause" standard, Cristal should have
            been allowed to proceed with her defense of the forfeiture
            action .................................................................................30

II.   The district court failed to correctly consider factors relevant to
      the decision whether to allow Cristal's untimely filing ...............35

      A.    The district court provided insufficient leeway given
            Cristal's *pro se* status and, in fact, erroneously held that
            status against her ...............................................................35

B.      The district court failed to consider, and thus gave insufficient weight to, the lack of prejudice to the government ............................................................................38

III.    Even under the "excusable neglect" standard, Cristal should have been allowed to proceed with her defense of the forfeiture action............................................................................................42

IV.     These black letter procedural errors are particularly significant given concerns that arise when the government terminates property rights.............................................................................47

CONCLUSION ...................................................................................50

CERTIFICATE OF COMPLIANCE .......................................................52

CERTIFICATE OF FILING AND SERVICE .......................................53

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*American Alliance Insurance Co. v. Eagle Insurance Co.*,
  92 F.3d 57 (2d Cir. 1996) ............................................................ *passim*

*Commercial Bank of Kuwait v. Rafidain Bank*,
  15 F.3d 238 (2d Cir. 1994) ...................................................................31

*Davis v. Musler*,
  713 F.2d 907 (2d Cir. 1983) ............................................... 21, 31, 33, 40

*Enron Oil Corp. v. Diakuhara*,
  10 F.3d 90 (2d Cir. 1993) ........................................................... *passim*

*Harmelin v. Michigan*,
  501 U.S. 957 (1991)..............................................................................48

*Leonard v. Texas*,
  137 S. Ct. 847 (2017).................................................................. 6, 7, 34

*Meehan v. Snow*,
  652 F.2d 274 (2d Cir. 1981) (per curiam) .................................... *passim*

*New York v. Green*,
  420 F.3d 99 (2d Cir. 2005) ..................................................................23

*Pecarsky v. Galaxiworld.com Ltd.*,
  249 F.3d 167 (2d Cir. 2001) ....................................................... *passim*

*Perez v. Wells Fargo N.A.*,
  774 F.3d 1329 (11th Cir. 2014) ...........................................................24

*Pincay v. Andrews*,
  389 F.3d 853 (9th Cir. 2004) ...............................................................43

*Pioneer Investment Services Co. v. Brunswick Associates*
  *Ltd. Partnership*,
  507 U.S. 380 (1993)................................................................. 44, 45, 46

*Shepard Claims Service, Inc. v. William Darrah & Assocs.*,
  796 F.2d 190 (6th Cir. 1986) ...............................................................32

*Silivanch v. Celebrity Cruises, Inc.*,
  333 F.3d 355 (2d Cir. 2003) .......................................... 29, 36, 37, 43

iii

*Traguth v. Zuck,*
  710 F.2d 90 (2d Cir. 1983) .......................................................... *passim*

*United States v. $10,300.00 U.S. Currency,*
  No. 10-CV-6103-CJS, 2013 WL 5705083 (W.D.N.Y. Oct. 17, 2013) ...............30

*United States v. $103,387.27,*
  863 F.2d 555 (7th Cir. 1988) ........................................... 20, 35, 39, 42

*United States v. $125,938.62,*
  370 F.3d 1325 (11th Cir. 2004) .................................................. 39, 40

*United States v. $22,050.00 U.S. Currency,*
  595 F.3d 318 (6th Cir. 2010) ...................................................... *passim*

*United States v. $27,601.00 U.S. Currency,*
  800 F. Supp. 2d 465 (W.D.N.Y. 2011) ........................................ 29, 30

*United States v. $417,143.48,*
  682 F. App'x 17 (2d Cir. 2017) ..........................................................29

*United States v. $5,227.00 U.S. Currency,*
  No. 12-CV-6528, 2013 WL 2450733 (W.D.N.Y. June 5, 2013) ................. 29, 30

*United States v. $541,395.06 U.S. Currency,*
  No. 10-cv-6555, 2012 WL 3614294 (W.D.N.Y. Aug. 21, 2012)........................30

*United States v. $8,040.00 United States Currency,*
  No. 21-cv-6323, 2022 WL 325175 (W.D.N.Y. Feb. 3, 2022) .......................6, 12

*United States v. Amiel,*
  995 F.2d 367 (2d Cir. 1993) ..............................................................27

*United States v. Cambio Exacto, S.A.,*
  166 F.3d 522 (2d Cir. 1999) ..............................................................21

*United States v. Contents of Acct. No. 901121707,*
  36 F. Supp. 2d 614 (S.D.N.Y. 1999) ...................................................29

*United States v. James Daniel Good Real Prop.,*
  510 U.S. 43 (1993)............................................................ 21, 47, 48

*United States v. Leasehold Interests in 118 Ave. D, Apartment 2A,*
  754 F. Supp. 282 (E.D.N.Y. 1990) .....................................................41

*United States v. One 1936 Model Ford V-8 De Luxe Coach,*
  307 U.S. 219 (1939).........................................................................49

iv

*United States v. One 1978 Piper Navajo PA-31 Aircraft*,
   748 F.2d 316 (5th Cir. 1984) ...............................................................30

*United States v. Sum of $185,336.07 U.S. Currency*,
   731 F.3d 189 (2d Cir. 2013) ................................................................34

**Statutes**

18 U.S.C. § 981(b)(2)(A) .........................................................................12

18 U.S.C. § 981(d) .....................................................................................8

18 U.S.C. § 983 ........................................................................................49

18 U.S.C. § 983(a)(2) .................................................................................7

18 U.S.C. § 983(a)(3) .................................................................................8

18 U.S.C. § 983(a)(3)(A) .................................................................... 12, 27

18 U.S.C. § 983(d)(2)(A)(i) ......................................................................34

19 U.S.C. § 1609 .......................................................................................8

21 U.S.C. § 881(a)(6) ............................................................................3–4

21 U.S.C. § 881(d) .....................................................................................8

28 U.S.C. § 1291 ........................................................................................4

28 U.S.C. § 1345 ........................................................................................4

28 U.S.C. § 1355 ........................................................................................4

28 U.S.C. § 1395 ........................................................................................4

Comprehensive Crime Control Act of 1984,
   Pub. L. No. 98-473, 98 Stat. 1837 ......................................................47

N.Y. C.P.L.R. § 1311 (McKinney)..........................................................14

N.Y. Crim. Proc. Law § 160.50 (McKinney) ..........................................11

**Rules and Regulations**

28 C.F.R. § 8.9 ...........................................................................................7

28 C.F.R. § 8.10 .........................................................................................7

Fed. R. App. P. 4(a)(1)(B) ........................................................................4

Fed. R. Civ. P. 55(c) ........................................................................ *passim*

Fed. R. Civ. P. 60(b) ................................................................... 22, 30

Fed. R. Civ. P. Supp. R. A(2) ............................................................27

Fed. R. Civ. P. Supp. R. G ...................................................... 46, 49

Fed. R. Civ. P. Supp. R. G(4)(a)(iii)(B) ....................................12–13

Fed. R. Civ. P. Supp. R. G(4)(b)(i) .................................................13

Fed. R. Civ. P. Supp. R. G(4)(b)(ii)(A) ..........................................13

Fed. R. Civ. P. Supp. R. G(5) ...........................................................8

Fed. R. Civ. P. Supp. R. G(5)(a)(ii) ................................................26

Fed. R. Civ. P. Supp. R. G(5)(a)(ii)(A) ..........................................13

**Other Authorities**

Christopher Ingraham, *How Police Took $53,000 from a Christian Band, an Orphanage and a Church*, Wash. Post (Apr. 25, 2016) ....................................7

German Lopez, *Wyoming Police Took an Innocent Man's $91,800. After a Vox Report, He Will Get It Back.*, Vox (Dec. 1, 2017) ........................................7

INSTITUTE FOR JUSTICE, DICK M. CARPENTER II, *ET AL.*, POLICING FOR PROFIT: THE ABUSE OF CIVIL ASSET FORFEITURE (2d ed. Nov. 2015) ...........47–48

INSTITUTE FOR JUSTICE, JENNIFER MCDONALD, CIVIL FORFEITURE, CRIME FIGHTING AND SAFEGUARDS FOR THE INNOCENT (Dec. 2018) ...........................8–9

INSTITUTE FOR JUSTICE, LISA KNEPPER ET AL., POLICING FOR PROFIT: THE ABUSE OF CIVIL ASSET FORFEITURE (3d ed. Dec. 2022) .............................. *passim*

Meagan Flynn, *She Saved Thousands to Open a Medical Clinic in Nigeria. U.S. Customs Took All of It at the Airport.*, Wash. Post (May 9, 2018) ....................................7

Michael Levenson, *Former Shoe Shiner Wins Back Nearly $30,000 Seized by Federal Agents*, N.Y. Times (Oct. 31, 2021) .........................7

Michael Sallah et al., *Stop and Seize*, Wash. Post (Sept. 6, 2014) ...........................7

Shaila Dewan, *Police Use Department Wish List When Deciding Which Assets to Seize*, N.Y. Times (Nov. 9, 2014) .............................48

U.S. DEP'T OF JUSTICE, DRUG ENFORCEMENT ADMIN., FY 2022
PERFORMANCE BUDGET CONGRESSIONAL BUDGET SUBMISSION .........................48

U.S. GOV'T ACCOUNTABILITY OFFICE, DEPARTMENT OF JUSTICE,
ALTERNATIVE SOURCES OF FUNDING ARE A KEY SOURCE OF
BUDGETARY RESOURCES AND COULD BE BETTER MANAGED
(Feb. 2015)......................................................................................9, 47

William Ramsey, *Taken*, Greenville News (Jan. 17, 2020)......................................7

**INTRODUCTION**

Every year, the federal government takes billions of dollars through civil forfeiture, and the majority of those forfeitures end with a missed deadline—rather than a decision on the merits. In part, this is because the average forfeiture is small, with half of federal forfeitures involving amounts below $12,090. Property owners often cannot afford to hire a lawyer to contest the forfeiture of their property, and, even if they could afford it, the cost of an attorney frequently exceeds the amount of property at issue. Forfeiture procedures are complex, and property owners often give up rather than try to fight.

This case involves a property owner who *did* try to fight. After local police seized Cristal Starling's $8,040 and transferred it to the U.S. Drug Enforcement Agency for federal civil forfeiture proceedings, Cristal tried to fight the forfeiture *pro se*—without hiring a lawyer. She successfully navigated DEA's administrative forfeiture procedures, filing the necessary paperwork to notify DEA of her interest in the property and terminate the administrative civil forfeiture. However, after the federal government filed a judicial civil forfeiture action in the district court, Cristal did not realize that she had to file *additional* papers to preserve her property rights.

Although Cristal missed the deadline to file a claim in the district court, she did appear in the case *before* any default judgment had been entered. The

1

government never tried to show that it was prejudiced by Cristal's late filing; after all, Cristal had already filed a claim in the administrative forfeiture proceeding, so the government was aware that she was claiming her $8,040. Cristal also made abundantly clear that she wanted to contest the civil forfeiture of her $8,040 on the merits. As Cristal told the district court, "I would like to move forward with court proceedings to have all of the funds returned to me." A-41.

Nonetheless, the district court entered default judgment, terminating Cristal's rights to her $8,040 without affording her any hearing on the merits. In doing so, the district court applied a rigorous "excusable neglect" standard, under which a party seeking an extension of time to respond to a complaint "will, in the ordinary course, lose." A-74. The district court also reasoned that Cristal's *pro se* status should weigh against her in the calculus, as a government attorney had advised her to hire a lawyer and her "decision not to seek an attorney's advice was a matter 'within [her] reasonable control,' which weighs against a finding of excusable neglect." A-75 (alteration in original).

In so holding, the district court committed four fundamental errors. First, the district court applied the wrong legal standard: the district court applied a rigorous "excusable neglect" standard, but, since Cristal appeared *before* default judgment had been entered, the case should have been analyzed under a more lenient "good cause" standard. Second, the district court failed to appropriately consider two

2

critical factors—Cristal's *pro se* status (which the district court considered but mistakenly treated as a reason *not* to forgive the default) and the lack of prejudice to the government (which the district court failed to consider at all). Third, even under the less forgiving "excusable neglect" standard, the district court should have forgiven the default. Finally, in committing these procedural errors, the district court gave insufficient weight to the significant concerns that arise when the government terminates property rights.

Given the number of civil forfeiture actions that end in default, the issues in this case have significance for the broader application of the civil forfeiture laws. They also have significance for Cristal personally. Cristal appeared below before final judgment and made clear that she wanted to fight to keep her $8,040. She should be given a chance to be heard.

## JURISDICTIONAL STATEMENT

The federal government filed this civil forfeiture case against $8,040 in U.S. Currency in the United States District Court for the Western District of New York on April 16, 2021. A-1, 4. The complaint specifically identified Appellant Cristal Starling as an individual with a potential interest in the defendant currency, as Cristal filed a claim in DEA's prior administrative forfeiture proceedings. *See* A-9. The complaint sought forfeiture of the defendant currency under 21 U.S.C.

§ 881(a)(6), and the district court properly exercised jurisdiction under 28 U.S.C. §§ 1345, 1355, and 1395.

On September 3, 2021, after Cristal missed the deadline under Federal Rule of Civil Procedure Supplemental Rule G to file a claim to the defendant currency, the government moved the district court to enter default judgment. A-2. Before the district court ruled on that motion, however, Cristal appeared *pro se* in the district court and submitted a number of filings making clear her desire to contest the forfeiture. A-2, 40, 41, 48, 58. On December 15, 2021, the government filed a motion to strike Cristal's claim to the currency as untimely. A-2.

On February 3, 2022, the district court issued a Decision and Order granting the government's motion to strike Cristal's claim and further granting the motion for default judgment. A-2, 65. Default judgment was entered on February 8, 2022. A-2, 78. Cristal then filed a timely notice of appeal on March 24, 2022. A-2, 81–82; *see also* Fed. R. App. P. 4(a)(1)(B) (providing 60 days to file a notice of appeal "if one of the parties is . . . the United States").

The district court's default judgment is "a final disposition of the case and an appealable order." *Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 170 (2d Cir. 2001). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Did the district court err when it required Cristal to show "excusable neglect" to justify her failure to file a timely claim, rather than applying the more lenient "good cause" standard that applies under Federal Rule of Civil Procedure 55(c) when a party appears prior to default judgment?

2. Did the district court err when it relied on Cristal's *pro se* status as a justification to strike her claim, rather than as a reason to excuse the procedural error and proceed to the merits?

3. Did the district court err by failing to consider, and thus giving insufficient weight to, the lack of prejudice to the government from the missed deadline?

4. Should Cristal Starling, a *pro se* civil forfeiture claimant, have been allowed to contest the forfeiture of her property on the merits, when she filed documents in the case prior to the entry of a default judgment clearly indicating her desire to challenge the forfeiture on the merits?

## STATEMENT OF THE CASE

This is an appeal from a default judgment that was entered in a civil forfeiture case by the Honorable Charles J. Siragusa of the United States District Court for the Western District of New York. As described in detail below, the district court entered default after Appellant Cristal Starling—*pro se* in the district court—missed the deadline to file a claim to $8,040 that was seized by local police

5

from her apartment and transferred to DEA for civil forfeiture proceedings. *See United States v. $8,040.00 United States Currency*, No. 21-cv-6323, 2022 WL 325175 (W.D.N.Y. Feb. 3, 2022); *see also* A-65–77. Although Cristal appeared in the case prior to entry of default judgment, the district court refused to forgive the missed deadline and forfeited Cristal's $8,040 by default.

## A.    Civil Forfeiture Generally

Civil forfeiture is a legal mechanism that allows law enforcement to take and keep property based on allegations of criminal wrongdoing, without obtaining a criminal conviction. Civil forfeiture "often enable[s] the government to seize the property without any predeprivation judicial process and to obtain forfeiture of the property even when the owner is personally innocent." *Leonard v. Texas*, 137 S. Ct. 847, 847 (2017) (Thomas, J., respecting the denial of certiorari). Although property is seized based on allegations of criminal wrongdoing, the "proceedings often lack certain procedural protections that accompany criminal proceedings, such as the right to a jury trial and a heightened standard of proof." *Id.* at 847–48. "Partially as a result of this distinct legal regime, civil forfeiture has in recent decades become widespread and highly profitable." *Id.* at 848. It has also "led to

6

egregious and well-chronicled abuses," which "frequently target the poor and other groups least able to defend their interests in forfeiture proceedings." *Id.*[1]

Civil forfeiture laws force property owners to run a gauntlet of procedures merely to win the opportunity to seek the return of their property. Most property is routed first to "administrative" forfeiture proceedings, and a property owner who wants to see a judge must file a timely claim with the law enforcement agency. *See* 18 U.S.C. § 983(a)(2); 28 C.F.R. §§ 8.9, 8.10. If the property owner is late filing a claim—or accepts the agency's invitation to file a "remission petition" rather than a claim—then the property owner loses the right to challenge the forfeiture in

---

[1] *See, e.g.*, INSTITUTE FOR JUSTICE, LISA KNEPPER ET AL., POLICING FOR PROFIT: THE ABUSE OF CIVIL ASSET FORFEITURE 20–21, 29, 38 (3d ed. Dec. 2022), available at https://ij.org/report/policing-for-profit-3/; Michael Sallah et al., *Stop and Seize*, Wash. Post (Sept. 6, 2014), available at https://wapo.st/3yk3uVG (multi-part series in the *Washington Post* documenting forfeiture abuses); William Ramsey, *Taken*, Greenville News (Jan. 17, 2020), available at https://bit.ly/2RTwksl (multi-part series from USA Today Network of journalists documenting forfeiture abuses); *see also* Michael Levenson, *Former Shoe Shiner Wins Back Nearly $30,000 Seized by Federal Agents*, N.Y. Times (Oct. 31, 2021), available at https://nyti.ms/3NkNoiK (federal agents took $28,180 in cash and then returned it after a "yearlong ordeal"); Meagan Flynn, *She Saved Thousands to Open a Medical Clinic in Nigeria. U.S. Customs Took All of It at the Airport.*, Wash. Post (May 9, 2018), available at https://wapo.st/2wbaqTv (federal agents took $41,000 that was intended to open a medical clinic in Nigeria); German Lopez, *Wyoming Police Took an Innocent Man's $91,800. After a Vox Report, He Will Get It Back.*, Vox (Dec. 1, 2017), available at https://bit.ly/3s1HGss (police seized over $91,000 from a touring musician who was planning to use the money to purchase a music studio); Christopher Ingraham, *How Police Took $53,000 from a Christian Band, an Orphanage and a Church*, Wash. Post (Apr. 25, 2016), available at https://wapo.st/2MVVZKn (police seized $53,000 from the tour manager for a Christian band, which was intended for an orphanage in Thailand).

court. *See* 19 U.S.C. § 1609; 21 U.S.C. § 881(d); *see also* 18 U.S.C. § 981(d). If the property owner does file an administrative claim, the government then files a judicial civil forfeiture action. *See* 18 U.S.C. § 983(a)(3). The property owner at that point is required to file *another* claim. *See* Fed. R. Civ. P. Supp. R. G(5). In other words, a property owner must make multiple filings over the course of months just to earn the right to contest the forfeiture.

Available data shows that forfeiture actions often involve relatively small amounts of money, and they typically end without any judicial decision on the merits. Between 2015 and 2019, half of the Department of Justice's currency forfeitures involved amounts below $12,090. *See* POLICING FOR PROFIT, *supra*, at 163. Given the amounts at issue, it often is neither feasible nor economically rational for property owners to hire a lawyer. *See id.* at 20–21.[2] Further, data shows that 78% of DOJ forfeitures never made it past the administrative forfeiture stage, meaning that property owners either did not file a timely claim or filed a claim that was in some way defective. *Id.* at 24. This is not necessarily for lack of effort on the part of property owners; data shows that DOJ rejected 35% of all claims to seized cash between 1997 and 2015 on technical procedural grounds. INSTITUTE

---

[2] POLICING FOR PROFIT offers a conservative estimate of $3,000 to hire a forfeiture lawyer to contest "a relatively simple state forfeiture case" and observes that "[h]iring an attorney to fight a federal forfeiture case is considerably more expensive." POLICING FOR PROFIT, *supra*, at 21.

FOR JUSTICE, JENNIFER MCDONALD, CIVIL FORFEITURE, CRIME FIGHTING AND

SAFEGUARDS FOR THE INNOCENT 9 (Dec. 2018).[3]

      Law enforcement has a financial incentive to aggressively enforce the civil

forfeiture laws. Under federal law, if property is seized by a state or local law

enforcement agency and turned over to DEA, the seizing agency receives up to

80% of the proceeds. POLICING FOR PROFIT, *supra*, at 46. Between 2000 and 2019,

New York law enforcement raked in a staggering $1.4 billion through this

"equitable sharing program." *Id.* at 124. Meanwhile, any proceeds that are not

returned to local law enforcement are deposited in DOJ's Asset Forfeiture Fund,

where they are available (without need for congressional appropriation) to fund

DOJ's operations. *See* U.S. GOV'T ACCOUNTABILITY OFFICE, DEPARTMENT OF

JUSTICE, ALTERNATIVE SOURCES OF FUNDING ARE A KEY SOURCE OF BUDGETARY

RESOURCES AND COULD BE BETTER MANAGED 50–53 (Feb. 2015).[4] In short, civil

forfeiture often involves small amounts of property, ties it up in a system that

property owners cannot navigate, and gives a substantial financial incentive to law

enforcement.

---

    [3] Available at https://ij.org/wp-content/uploads/2018/11/Forfeiture-White-Paper_Final.pdf.

    [4] Available at https://www.gao.gov/assets/gao-15-48.pdf.

**B.     The Seizure of Cristal Starling's $8,040**

Cristal Starling is an adoptive caretaker of a child with significant medical needs, and she lives in Rochester, New York. A-41. Although the record below contains few other details about Cristal, if she were given an opportunity to contest the forfeiture on the merits, she would show that she makes money operating a food cart, as well as working catering jobs and (at times) working as a home health aide. She would also show that she had hoped to use the money at issue in this litigation to expand her food cart into a food truck.[5]

In 2020, Cristal was dating a man named Kendrick Bronson; they are not dating any longer. A-41. In October 2020, police raided a home that they claimed was associated with Kendrick, and, at the home, they found a variety of narcotics. A-8. At the same time, police raided Cristal's apartment, where they found Cristal, her child, and Kendrick. A-7. The police found nothing illegal in Cristal's apartment. *Id.*[6] However, the police did find $7,500 in the "top dresser drawer of the master bedroom," as well as $540 in "the pants pocket of a pair of women's

---

[5] Because these facts are not in the record, Appellant does not rely upon them for purposes of this appeal, but Appellant offers them here to provide a sense of the facts that she would seek to introduce into the record if given an opportunity to contest the forfeiture on the merits.

[6] The Complaint stated that police found ten strips of Suboxone in a dresser drawer. A-7. Suboxone, however, is not illegal; it is a prescription medication used to treat opioid dependence. *See* Mayo Clinic, https://tinyurl.com/2p98dxn6 (last visited June 25, 2022). The government did not claim that it was illegal to possess Suboxone and did not base the forfeiture on the presence of Suboxone.

jeans that were laying on the floor in the hallway adjacent to the master bedroom." *Id.* That is the $8,040 that Cristal has claimed as hers. Police arrested Kendrick and seized Cristal's money.

## C.    The Administrative Forfeiture Proceedings

Kendrick was charged with drug offenses in state court, but he was ultimately acquitted. *See* A-40, 41, 65.[7] In the meantime, however, Cristal's $8,040 was transferred to DEA, which commenced administrative forfeiture proceedings against the cash. A-4, 9.

Proceeding *pro se* before the agency, as in the later judicial forfeiture action, Cristal filed both a remission petition and an administrative claim with DEA. A-48. DEA's standard notice letter instructs property owners to file either a petition (which is the civil forfeiture equivalent of a pardon petition) or a claim (which operates as a request to terminate administrative proceedings and go to court), but also states that property owners have the option to file both.[8] Cristal's decision to

---

[7] Cristal repeatedly stated that Kendrick had been "acquitted," and attorneys for the government did not dispute those statements. The state court records of the disposition have been sealed, which is consistent with Cristal's understanding of what happened in the case. *See* N.Y. Crim. Proc. Law § 160.50 (McKinney) (providing that court records should be sealed following the "termination of a criminal action or proceeding against a person in favor of such person").

[8] For a sample of DEA's standard notice letter, see https://ij.org/wp-content/uploads/2020/01/Notice-of-Seizure_Redacted.pdf.

make both filings demonstrates her diligence to ensure that she was taking all possible steps to contest the forfeiture.

Although DEA would have resolved the remission petition internally, without providing any kind of hearing before a judge, Cristal's filing of an administrative claim terminated the administrative forfeiture proceeding and triggered the requirement for the government to either return the money or file a judicial forfeiture action. *See* 18 U.S.C. § 983(a)(3)(A).

## D.    The Judicial Forfeiture Action

On April 16, 2021, the U.S. Attorney's Office for the Western District of New York filed a judicial forfeiture action against Cristal's $8,040. A-4; *see also* 18 U.S.C. §§ 981(b)(2)(A), 983(a)(3)(A). The Complaint did not allege any wrongdoing by Cristal. Instead, it claimed the money was subject to civil forfeiture because it was purportedly linked to Kendrick's alleged drug activity. A-9. As is typical in civil forfeiture actions, the $8,040 was named as the defendant, and the case was styled as "*United States v. $8,040.00 United States Currency*." A-4.

Although the government is required to notify property owners after filing a civil forfeiture action, the notice requirement is less robust than in a typical civil action. Notice may be completed by posting on "an official internet government forfeiture site" for 30 consecutive days, and, where there is a known potential claimant, by sending them notice and a copy of the complaint. Supp. R.

12

G(4)(a)(iii)(B), G(4)(b)(i). In this case, the government served Cristal with notice of the forfeiture action by sending a copy of the Complaint to her address via FedEx on June 14, 2021. A-26.[9]

Once the government sent this notice to Cristal, it triggered a deadline for Cristal to file a *second* claim to her $8,040, this time in the forfeiture proceeding. *See* Fed. R. Civ. P. Supp. R. G(5)(a)(ii)(A). There is no dispute that Cristal failed to file this second claim within the time set by the governing rules.[10] The government notified the court of the missed deadline on August 20, and, on August 24, the clerk of court entered a notice of default, as a preliminary step prior to a default judgment. A-2, 27, 30, 35. The government filed a Motion for Default Judgment on September 3. A-2, 67.

When Cristal made her first appearance on the docket, on November 30, 2021, it became immediately apparent that Cristal had not fully understood the technical distinctions between the various state and federal proceedings and, as a result, had not understood that she was required to file a second claim in this federal forfeiture action. A-2, 40. Cristal submitted a letter stating that she was

---

[9] The district court found that there was "no suggestion by either party that this notice was returned to the government, or that the government was otherwise informed that the notice was undeliverable." A-74.

[10] A claim must be filed within the time set by the notice of forfeiture. *See* Supp. R. G(4)(b)(ii)(A). In this case, the notice gave Cristal until July 16, 2021 to file a claim. *See* A-31–32.

"writing to notify the courts that the defendant of the case stemming from the warrant execution, Kendrick Bronson, was recently acquitted of all charges" and that "I have been advised to contact this office to have a motion filed on the docket to have my money be released and returned to me." A-40.

In another letter, Cristal explained that her confusion stemmed in part from her conversations with a state attorney prosecuting the criminal action. Cristal stated that she "contacted and followed the advice of the district attorney" assigned to Kendrick's case, who told her "that there would be no release of funds until the [criminal] case was closed." A-48.[11] The government disputed that these conversations occurred, and the government submitted affidavits by the Assistant District Attorneys in Kendrick's case, Jonathan Jirik and Eleanor Biggers, stating that they "do not recall" communications with Cristal. A-56; *see also* A-53, 69. In response, Cristal gave dates and details of the conversations, explaining that ADA Biggers had provided this information when speaking with Cristal about the return of a vehicle that had also been seized during the raid. A-59. To support her version

---

[11] At the time of the conversation, the state prosecutor may not have realized that the funds had been transferred to DEA for forfeiture under federal law. Under New York law, state court forfeiture actions are stayed pending the resolution of any related criminal proceeding. *See* N.Y. C.P.L.R. § 1311 (McKinney). The federal government may also—and frequently does—move to stay a federal forfeiture action pending related criminal proceedings, *see supra* p. 41, but under federal law there is no such automatic stay.

of events, Cristal also provided a Property Release Authorization Form with ADA Biggers's signature releasing the seized vehicle to Cristal. A-62.

Notwithstanding this confusion, Cristal's letters made clear that she wanted to fight the forfeiture of her $8,040. Cristal's first letter stated that she wanted to "have a motion filed on the docket to have my money be released and returned to me." A-40. Her next letter stated that "I would like to move forward with court proceedings to have all of the funds returned to me promptly." A-41. Cristal's second letter also disclosed that the government had extended a settlement offer under which the government would agree to return half the $8,040, while forfeiting the other half. *Id.* Cristal rejected the settlement offer, preferring instead to fight for the return of all her money. *Id.* The district court accordingly construed these letters as a claim to the $8,040. *See* A-67–68.

When Cristal submitted her claim, the government's Motion for Default Judgment was still pending—meaning that no final judgment had yet been entered in the case. *See* A-2. Subsequently, on December 15, 2021, the government filed a motion to strike Cristal's claim on the ground that it was untimely. A-2, 68.

Cristal filed another letter, responding to the government's Motion to Strike, on January 4, 2022; the government filed a reply in support of its Motion to Strike on January 7; and then Cristal submitted a final letter on January 11. *See* A-2. These filings include the back-and-forth, discussed above, concerning whether

15

Cristal was in fact misled by her conversations with one of the state attorneys prosecuting Kendrick's criminal case. In her final letter, Cristal explained that ADA Biggers had told her "that the money was being held as evidence and if I had any chance at getting the money back at all, it wouldn't be until the case had been concluded." A-59. Cristal also stated that ADA Biggers had told "me to speak to my attorney if I have any questions regarding the money." *Id.*

Cristal closed with one final plea: "My attention to this matter has always been unyielding and unfaltering. I have responded to every correspondence received to make a claim to my money and I have provided information that supports the truth of these matters." A-59. She asked for her money back so that she could "move forward with [her] life." A-60. This was the last substantive filing by either party, on January 11, 2022. A-2, 58.

**E.    The Default Judgment Against Cristal's Cash**

On February 3, 2022, the district court issued its Decision & Order striking Cristal's claim and entering default judgment. A-65. The court construed Cristal's filings as, "in effect, a motion for a retroactive extension of time to file her verified claim." A-73.

The district court held that the decision whether to forgive Cristal's untimely filing was governed by a highly demanding "excusable neglect" standard. A-73. The court stated that the standard has four factors: (1) the danger of

16

prejudice to the non-movant; (2) the length of the delay and its impact on proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith. *Id.* (citation omitted). However, the court stated that the analysis should "focus[ ] particularly on the reason for delay" and that the "equities will rarely if ever favor a party who fails to follow the clear dictates of a court rule." A-73–74 (marks and citation omitted). The court stated that "where the rule is entirely clear" a party claiming excusable neglect "will, in the ordinary course, lose." A-74 (marks and citation omitted). Further, "[c]ourts in this circuit routinely strike claims in federal forfeiture actions." A-73 (marks and citation omitted).

Applying this demanding standard, the district court held that Cristal could not show excusable neglect because she had "failed to demonstrate that her diligence, such as it was, was in accordance with well-settled laws, rules and procedures regarding the filing of claims in a civil forfeiture action." A-75. The court noted that federal law "plainly outlines the process for litigating a claim once an administrative claim is filed" and that federal law "make[s] clear" that a property owner "must file his or her claim in [the] court proceeding pursuant to the Supplemental Rules" of civil procedure. A-75–76. In other words, because the rule was clear, the district court held that Cristal could not show excusable neglect to overcome the late filing.

17

In addition, the district court declined to grant Cristal any additional leeway in light of her *pro se* status. The district court noted that ADA Biggers had "encouraged [Cristal] to seek the advice of legal counsel"—thus implicitly accepting Cristal's account of her conversations with the state prosecutor. A-75. And the court stated that Cristal's "decision not to seek an attorney's advice was a matter 'within [her] reasonable control,' which weighs against a finding of excusable neglect." *Id.* (citation omitted) (alteration in original). In other words, rather than treating Cristal's *pro se* status as a reason to forgive the late filing, the district court treated her failure to hire an attorney as a factor that "weighs against" leniency.

Having concluded that Cristal could not show "excusable neglect," the district court struck Cristal's claim as untimely, held that Cristal could not challenge the forfeiture because she had not filed a timely claim, and entered default judgment forfeiting Cristal's $8,040 to the federal government. A-76–77.

## SUMMARY OF THE ARGUMENT

**I.** The district court committed legal error when it analyzed the case under the "excusable neglect" standard. Rather, when a litigant misses the deadline to respond to the Complaint but nonetheless appears *before* the entry of an actual default judgment, the case is properly analyzed under the more lenient "good cause" standard of Rule 55(c). *See United States v. $22,050.00 U.S. Currency*,

18

595 F.3d 318, 320, 324 (6th Cir. 2010). Under the good cause standard, "the extreme sanction of a default judgment must remain a weapon of last, rather than first, resort," *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981) (per curiam), and that "extreme sanction" should not have been applied in this case.

**II.** The district court also committed legal error when it failed to adequately consider factors that—under any legal standard—should have been highly relevant to the decision whether to forgive the missed deadline. In particular, the district court failed to adequately consider both Cristal's *pro se* status and the lack of prejudice to the government.

**A.** The district court gave insufficient weight to Cristal's status as a *pro se* litigant and, in fact, treated it as a factor that weighed *against* excusing the late filing. This Court has instructed that "a district court should grant a default judgment sparingly and grant leave to set aside the entry of default freely when the defaulting party is appearing *pro se*." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). The district court, however, made clear that it was applying a far more stringent standard, under which a party that misses a clear deadline "will, in the ordinary course, lose." A-75 (citation omitted). Indeed, rather than granting Cristal extra leeway as a *pro se* litigant, the district court held that Cristal should be faulted for her decision not to hire a lawyer, which, as a decision within her

19

"reasonable control," "weighs against a finding of excusable neglect." A-75. In doing so, the district court got the law exactly backwards.

**B.** The district court also gave insufficient weight to the lack of prejudice to the government from the missed deadline. The government did not even attempt to show that it was prejudiced, and in fact the government already knew that Cristal was claiming her money based on other papers that she had submitted during the prior administrative forfeiture proceedings. As in *United States v. $103,387.27*, 863 F.2d 555, 563 (7th Cir. 1988), the "district court failed to consider several essential factors such as the apparent lack of prejudice to the government" when it refused to allow Cristal to contest the forfeiture of her money.

**III.** Even imagining the "excusable neglect" standard should apply to this case, the district court erred when it resolved this case based on a missed deadline—rather than requiring the government to make its case on the merits. "It is well established that default judgments are disfavored," and "[a] clear preference exists for cases to be adjudicated on the merits." *Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 174 (2d Cir. 2001). Accordingly, "'excusable neglect' is to be construed generously in the context of an attempt to vacate a default judgment." *Am. All. Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 58 (2d Cir. 1996).

**IV.** Finally, in addition to misapplying black letter procedural law, the district court gave insufficient weight to the concerns that arise when the

government seeks to take property using civil forfeiture. As the Supreme Court has observed, the "purpose of an adversary hearing is to ensure the requisite neutrality that must inform all governmental decisionmaking," and "[t]hat protection is of particular importance here, where the Government has a direct pecuniary interest in the outcome of the proceeding." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55–56 (1993). Cristal appeared in the case and asked to fight, and she should have been given the chance to do exactly that.

## STANDARD OF REVIEW

The district court's legal rulings, including the decision of what standard to apply, are reviewed *de novo*. *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999); *see also Meehan*, 652 F.2d at 275 (reversing entry of default judgment because it was "imposed under an incorrect standard"). The district court's application of the proper legal standard—to determine whether to enter default judgment—is reviewed for abuse of discretion. *Pecarsky*, 249 F.3d at 171; *Enron Oil Corp.*, 10 F.3d at 95. However, appellate review is less deferential than normal when—as here—default occurs on the papers at the pre-answer stage; that is because the district court had no "more than marginal familiarity with the parties." *Davis v. Musler*, 713 F.2d 907, 912–13 (2d Cir. 1983). On appeal from a default judgment, "an abuse of discretion 'need not be glaring' to justify reversal of a district court order." *Id.* at 913 (citation omitted).

## ARGUMENT

**I.  The district court erred by analyzing the case under the "excusable neglect" standard, rather than the more lenient "good cause" standard.**

This Court has recognized that there is a "strong polic[y] favoring the resolution of genuine disputes on their merits." *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983); *see also Enron Oil Corp.*, 10 F.3d at 96 ("[D]efaults are generally disfavored."). On the other hand, that "strong policy" loses some of its force once a final default judgment has been entered, as, once a final judgment is in place, "concepts of finality and litigation repose are more deeply implicated." *Id.* In recognition of that balance of interests, Federal Rule of Civil Procedure 55(c) provides that a final default judgment can only be set aside based on a finding of "excusable neglect," whereas a clerk's preliminary entry of default—which occurs after a failure to timely respond to a complaint—can be set aside for "good cause."[12] This Court has explained that the "good cause" standard is "lenient" and "less rigorous than the 'excusable neglect' standard for setting aside a default judgment." *Meehan*, 652 F.2d at 276–77.

In this case, where Cristal appeared in the action after the clerk had entered a notice of default but before a final default judgment had been entered, the district

---

[12] Specifically, Rule 55(c) states that a "court may set aside an entry of default for good cause" and that a final default judgment may be set aside "under Rule 60(b)." Rule 60(b), in turn, adopts the "excusable neglect" standard.

court erred as a matter of law by analyzing the case under the "excusable neglect" standard rather than the more lenient "good cause" standard. Indeed, as explained in detail *infra* pp. 27-29, the Sixth Circuit has held that a district court erred by applying the "excusable neglect" standard (as the district court did here) under strikingly similar circumstances. *See United States v. $22,050.00 U.S. Currency*, 595 F.3d 318, 320 (6th Cir. 2010). In this case, as well, the district court's application of the more demanding "excusable neglect" standard was legal error. And, under the appropriate "good cause" standard, Cristal should have been allowed to proceed to the merits of the case.

A. *Under ordinary procedural rules, this case should have been analyzed under the "good cause" standard.*

The Federal Rules of Civil Procedure are clear that, before a final default judgment has been entered, the decision whether to excuse a late filing and proceed to the merits is analyzed under a "good cause" standard. Fed. R. Civ. P. 55(c); *see New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005) ("A court may set aside any default that has entered for good cause shown."). It is also well established that the "good cause" standard is a "lenient" one, *Meehan*, 652 F.2d at 277, and "less rigorous" than the excusable neglect standard that applies after default judgment has been entered, *Am. All. Ins. Co.*, 92 F.3d at 59; *see also Meehan*, 652 F.2d at 276 ("[T]he standard for setting aside the entry of a default pursuant to Rule 55(c) is less rigorous than the 'excusable neglect' standard for setting aside a

23

default judgment."). The good cause standard "should be construed generously," and all doubts should be resolved in favor of the defaulting party. *Enron Oil Corp.*, 10 F.3d at 96. Because no default judgment had been entered when Cristal made her appearance, it is black letter law that this lenient good cause standard should have applied.

It makes no difference to this analysis that the district court framed the question as whether to allow an untimely claim, rather than as whether to set aside the clerk's notice of default. *See* A-72–73. The Eleventh Circuit addressed the application of the "good cause" standard in *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1338 (11th Cir. 2014), and rejected the argument that the "excusable neglect" standard should apply because the relevant motion was characterized as a motion to allow an untimely answer, rather than to lift the clerk's notice of default. The Eleventh Circuit explained that the "characterization of [the] motion . . . did not somehow change the nature of the relief that [the non-defaulting party] actually sought—effectively, a default judgment." *Id.* Accordingly, the defaulting party was "entitled to have her motion to file an out-of-time answer to the counterclaim considered under the 'good cause' standard applicable to setting aside a default rather than under the 'more rigorous,' 'excusable neglect' standard." *Id.* Likewise, here, regardless of whether the issue is framed as whether to set aside the clerk's

24

entry of default or, instead, to allow an untimely claim, the "good cause" standard should have applied.

Precedent from this Court is in accord. In particular, in *Meehan*, the Court held that the "good cause" standard should have applied where the issue was framed in the district court as whether to enter a default judgment—rather than whether to set aside the clerk's entry of default. *Meehan*, 652 F.2d at 276. The Court explained that it made no difference whether the issue was framed as whether to enter default judgment or, instead, whether to set aside the clerk's entry of default, as "opposition to a motion for a default judgment can be treated as a motion to set aside the entry of a default despite the absence of a formal Rule 55(c) motion" to set aside the entry of default. *Id.*[13] Thus, the Court held that the district court had erred given its "failure, in considering the appellants' opposition to the motion for a default judgment, to apply the Rule 55(c) standard for setting aside the entry of a default." *Id.* The Court's decision makes clear that, so long as a defaulting party appears before default judgment has been entered, the Rule 55(c)

---

[13] In *Meehan*, the clerk had never taken the formal step of entering default, and the non-defaulting party skipped that step and directly asked the district court to enter default judgment. *See* 652 F.2d at 276. Given that the same standard applied regardless of how the issue was framed, the Court explained that the "omission of the entry of a default was largely technical." *Id.*

"good cause" standard governs the question of whether to forgive the default and proceed to the merits, and that is true regardless of how the question is framed.[14]

### B. Nothing about the civil forfeiture context requires a departure from the ordinary "good cause" standard.

Notwithstanding the general rules discussed above, the district court held that whether to extend the time to file a claim in a forfeiture case should be decided under an "excusable neglect" standard. A-73. This, however, was error, as nothing about the civil forfeiture context changes the analysis.

To begin with, the rules applicable to forfeiture proceedings explicitly contemplate that the decision whether to allow an untimely claim will be assessed under a good cause standard. Supplemental Rule G(5)(a)(ii) sets the time in which a property owner must file a claim following a forfeiture complaint but also states that a court may "set[ ] a different time" based on a showing of "good cause." Thus, Supplemental Rule G explicitly recognizes that the decision whether to

---

[14] That is doubly true here given Cristal's *pro se* status. The district court construed Cristal's letters as a motion to file an out-of-time claim to the property, but the court could have just as easily construed the letters as a motion to set aside the clerk's entry of default; indeed, to the extent that the construction of the filings made any difference to the governing standard, the district court erred by not adopting the construction most favorable to Cristal. *See Traguth*, 710 F.2d at 94–95 (holding that a *pro se* litigant's "request should . . . have been considered as a motion to set aside an entry of default" in light of the "obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training").

extend the time to file a claim in a forfeiture case is governed by the same "good cause" standard that applies in every action under Rule 55(c).[15]

Furthermore, Rule 55(c) itself also continues to apply in the civil forfeiture context, as "[t]he Federal Rules of Civil Procedure also apply to [civil forfeiture] proceedings except to the extent that they are inconsistent with the[] Supplemental Rules." Supp. R. A(2); *see also United States v. Amiel*, 995 F.2d 367, 371 (2d Cir. 1993) ("The Federal Rules of Civil Procedure also apply to civil forfeitures except to the extent they are inconsistent with the Supplemental Rules."). Nothing in the Supplemental Rules contradicts the good cause standard adopted by Rule 55(c). To the contrary, as noted above, the Supplemental Rules dovetail perfectly with Rule 55(c) insofar as they recognize that the time to file a claim can be extended based on a showing of "good cause."

For this reason, the Sixth Circuit in *$22,050.00 U.S. Currency*, 595 F.3d at 320, held that a district court erred by requiring a finding of "excusable neglect" to excuse a late claim. In that case, as here, the claimant appeared in the action after the entry of default but before a final default judgment, and the government

---

[15] There is some symmetry to the application of the "good cause" standard here, as the good cause standard is also applied to a request by the government to extend the deadline to file a forfeiture complaint after a claimant has filed a claim in the administrative proceeding. 18 U.S.C. § 983(a)(3)(A). Applying the good cause standard to the government when it seeks to extend its deadline to file a complaint, but then applying a different standard to an individual in the same action when responding to the complaint, would disturb that balance.

responded to the claimant's appearance by moving to strike the claim as untimely. *See id.* at 321. The district court denied the motion to set aside the default and granted the motion to strike the claim. *See id.* On appeal, the Sixth Circuit held that the district court had erred by failing to apply the "extremely forgiving" good cause standard under Rule 55(c). *Id.* at 322. The Sixth Circuit explained that "Rule 55(c) exists to handle this exact scenario" and found "no compelling functional difference between forfeiture cases involving known claimants and other civil cases with regard to how to deal with late response." *Id.* at 323. It saw "no less of a preference for seeing forfeiture cases decided on their merits than civil cases generally, and we find no greater prejudice due to delay in forfeiture cases than in civil cases generally." *Id.*

The Sixth Circuit's decision in *$22,050.00* should apply to this case. The Sixth Circuit expressly held "that in civil forfeiture cases such as this one, where the question is whether to excuse a known claimant's failure to file a verified claim and answer in the allotted time, district courts should analyze the case using the generally applicable Federal Rules," meaning, when a property owner appeared before final judgment, that the "proper way to analyze this case is to focus on the general Rule 55(c) test for setting aside default." *Id.* at 323–24. And the Sixth Circuit expressly rejected the argument that the Rule 55(c) standard should somehow be overridden by a nebulous requirement of "strict compliance" with

procedural deadlines in forfeiture cases. *Id.* The same is true here. Because Cristal appeared prior to entry of final judgment, it is black letter law that the Rule 55(c) standard should have applied.

The Second Circuit, meanwhile, has never required an excusable neglect showing in a forfeiture case in which an unwitting litigant appears for the first time after the entry of default but before default judgment.[16] The district court here did cite some district court cases from within the Second Circuit that have applied the excusable neglect standard in these circumstances, but those decisions are not binding authority.[17] To the contrary, those district court decisions form an isolated, self-created body of law, unmoored from broader legal practice. The cases cite other lower court cases, cite each other, or cite cases applying excusable neglect in other contexts where Rule 55(c) would not apply.[18] This Court should not follow

---

[16] The Court's unpublished opinion in *United States v. $417,143.48*, 682 F. App'x 17, 18 (2d Cir. 2017), affirmed a district court's decision not to allow a late filing, but it did not address whether excusable neglect is the proper standard or identifiably rely on the standard. *Id.* at 19. This unpublished opinion, which did not expressly consider the proper standard, should not serve as a basis to override both the Supplemental Rules and Federal Rules of Civil Procedure.

[17] *See United States v. Contents of Acct. No. 901121707*, 36 F. Supp. 2d 614, 616–17 (S.D.N.Y. 1999) (finding litigant had not shown "excusable neglect" for their lack of "strict compliance" with the Supplemental Rules); *United States v. $27,601.00 U.S. Currency*, 800 F. Supp. 2d 465, 467–68 (W.D.N.Y. 2011) (same); *United States v. $5,227.00 U.S. Currency*, No. 12-CV-6528, 2013 WL 2450733, at *2 (W.D.N.Y. June 5, 2013) (same).

[18] *$5,227.00 U.S. Currency*, 2013 WL 2450733, at *2 (citing *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355 (2d Cir. 2003), which considered "excusable neglect" for filing an untimely notice of appeal); *$27,601.00 U.S. Currency*, 800 F.

these non-binding district court cases and should, instead, follow the Sixth

Circuit's decision in *$22,050.00*, which is on all fours with this case, as well as

non-forfeiture precedents both from this Court and other Circuits that apply the

more lenient Rule 55(c) "good cause" standard prior to the entry of default

judgment.

C. *Under the "good cause" standard, Cristal should have been allowed to*
*proceed with her defense of the forfeiture action.*

Applying the proper "good cause" standard, the district court should have

lifted the entry of default and excused Cristal's untimely filing. *See Meehan*,

652 F.2d at 276–77 (first holding that district court applied the incorrect standard

and then going on to hold that untimely filing should be excused under the correct

"good cause" standard). After all, "the extreme sanction of a default judgment

must remain a weapon of last, rather than first, resort." *Id*. at 277. The appropriate

response to Cristal's late appearance and desire to litigate would have been to give

her a second chance, not to enter default judgment.

---

Supp. 2d at 467 (citing nothing for the application of excusable neglect to a late-filed answer); *United States v. $541,395.06 U.S. Currency*, No. 10-cv-6555, 2012 WL 3614294, at *3–4 (W.D.N.Y. Aug. 21, 2012) (issued by the district court judge that entered default judgment against Cristal and citing *United States v. One 1978 Piper Navajo PA-31 Aircraft*, 748 F.2d 316, 318 (5th Cir. 1984), which applied excusable neglect when called for by Federal Rule of Civil Procedure 60(b)); *United States v. $10,300.00 U.S. Currency*, No. 10-CV-6103-CJS, 2013 WL 5705083, at *4 (W.D.N.Y. Oct. 17, 2013) (quoting *$5,227.00 U.S. Currency*, 2013 WL 2450733, at *4, the first case in this string cite).

Courts examine three factors under Fed. R. Civ. P. 55(c) when considering whether to set aside a default for good cause: (1) the willfulness of the defaulting party; (2) prejudice to the non-movant; and (3) whether the defaulting party has a meritorious defense. *Meehan*, 652 F.2d at 277; *see also Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243 (2d Cir. 1994). In applying these factors, "all doubts should be resolved in favor of those seeking relief under Rule[] 55(c)." *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983). Moreover, as explored further *infra* pp. 35-38, that is particularly the case here, where Cristal was proceeding *pro se*, as courts must seek to protect a *pro se* litigant from "waiving [her] right to be heard because of [] her lack of legal knowledge." *Enron Oil Corp.*, 10 F.3d at 96; *see also Traguth*, 710 F.2d at 95 (stating that the right to self-representation "should not be impaired by harsh application of technical rules."). With that framing in mind, all three elements of the lenient good cause standard support allowing Cristal to continue to seek the return of her money.

**1.** First, Cristal's default was not willful. This Court has explained that "willfulness" in the default judgment context does not include carelessness or negligence and instead requires some "egregious or deliberate conduct." *Am. All. Ins. Co.*, 92 F.3d at 61.[19] Thus, even conduct that is "grossly negligent" can fall

---

[19] The Court offered this explanation in the context of a motion to vacate a default judgment. If anything, an even greater showing of "willfulness" should be required where a party appears before final judgment.

short of "willful." *Id.* Or, as the Sixth Circuit has held, even "careless and inexcusable" delay can be forgiven under Rule 55(c), so long as the delay was not "willful." *Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 194 (6th Cir. 1986); *see also $22,050.00*, 595 F.3d at 325–26 (suggesting that untimely claim should be forgiven absent some "indicia that the claimant was intentionally gaming the system"); *id.* at 327 (holding that, "in the context of Rule 55(c), mere negligence or failure to act reasonably is not enough to sustain a default").

The record here shows that Cristal, a *pro se* litigant, endeavored to the best of her ability to comply with the procedural requirements to contest the forfeiture. *See Enron Oil Corp.*, 10 F.3d at 97–98 (finding no willful delay where defendant's "conduct and *pro se* correspondence evidences his intent to fulfill his obligations as a litigant"). Cristal filed both a remission petition and a claim in the administrative forfeiture proceeding. A-9, 48. She asked state prosecutors about the return of her money. A-48, 59–60. When Kendrick was acquitted, she promptly notified the court. *See* A-40 ("I understand that this money has since been in the custody of The Western District of New York. . . [My ex-boyfriend] was recently acquitted of all charges. I have been advised to contact this office . . . to have my money be released . . . ."); A-41 ("I would like to move forward with court proceedings to have all of the funds returned to me promptly."). When the

32

government asked to strike her claim, she promptly responded. A-48. When the
government replied, she filed a sur-reply five days later. A-2, 58. Cristal was not a
recalcitrant litigant flouting the courts, and her lateness was not willful.

2. Second, as discussed further *infra* pp. 38-42, the government also offered
no evidence to show that it would suffer any prejudice as a result of allowing
Cristal to contest the forfeiture. In fact, there is no possible prejudice, as the
government was well aware that Cristal was contesting the forfeiture given the fact
that she filed a claim in the administrative forfeiture proceeding. A-9. The only
possible "prejudice" to the government would be delay in the resolution of this
civil forfeiture case, but delay alone does not constitute prejudice. *Davis*, 713 F.2d
at 916. For delay to matter, it must lead to loss of evidence, increased difficulties in
discovery, or greater opportunity for fraud and collusion. *Id.* The government,
however, has not even tried to show any such prejudice here. Nor could it.

3. There can also be no real dispute that Cristal had a meritorious defense to
the government's civil forfeiture action. After all, Cristal argued that she was an
innocent owner of the seized cash, and that her ex-boyfriend whose alleged crime
led to the seizure had been acquitted on all charges. *See* A-40 ("[T]he defendant of
the case stemming from the warrant execution, [], was recently acquitted of all
charges."); A-41 ("The charges that stemmed from the execution of the search
warrant . . . [have] since been dismissed based on Acquittal of all matters . . . .").

Innocence is a meritorious defense to civil forfeiture. 18 U.S.C. § 983(d)(2)(A)(i);
*see also $22,050.00*, 595 F.3d at 326 (even a "hint of a suggestion" that controlled
substance laws had not been violated was sufficient to show a meritorious defense,
in order to set aside a default judgment (marks and citation omitted)).

Moreover, even setting aside the fact that Kendrick was acquitted of the
alleged drug activity that forms the predicate for the forfeiture, nothing in the
government's complaint tied the money found in Cristal's apartment to Kendrick's
alleged drug dealing. *See* A-7. As Cristal pointed out in one of her letters, the
government claimed to have found illegal drugs in an entirely different residence,
whereas "[t]here was nothing illegal found in my home at all." A-41. The lack of
apparent connection between the seized cash and the alleged drug activity should
also be fatal to the government's case. *See, e.g.*, *United States v. Sum of
$185,336.07 U.S. Currency*, 731 F.3d 189, 196–97 (2d Cir. 2013) (rejecting
forfeiture where money was not sufficiently tied to alleged drug activity).

Lastly, even if the government were somehow able to proceed with the
forfeiture notwithstanding the above, Cristal would also be able to raise a
potentially meritorious constitutional challenge to the forfeiture of her $8,040. *See
Leonard*, 137 S. Ct. at 849–50 (raising doubts about the constitutionality of modern
civil forfeiture). Indeed, if the default is lifted, Cristal fully intends to raise a suite
of constitutional claims on remand to the district court.

**II.    The district court failed to correctly consider factors relevant to the decision whether to allow Cristal's untimely filing.**

Even apart from the district court's application of an erroneous standard, the district court below committed legal error insofar as it failed to correctly consider several important factors that were highly relevant to the decision whether to allow Cristal's untimely claim. *See $103,387.27*, 863 F.2d at 563 (reversing denial of leave to file out-of-time claim where the "district court failed to consider several essential factors"). In particular, the district court failed to give Cristal any leeway based on her *pro se* status, and, in fact, erroneously held that fact *against* Cristal in its analysis. In addition, while the lack of prejudice to the government should have provided an additional powerful reason to forgive the untimely filing, the district court failed to consider that factor.

*A.    The district court provided insufficient leeway given Cristal's* pro se *status and, in fact, erroneously held that status against her.*

The district court's opinion makes clear that the court did not grant Cristal any additional leeway as a *pro se* plaintiff and, to the contrary, faulted Cristal for not hiring an attorney. The court "recognize[d] that Claimant's lack of training in the law is a disadvantage to her knowledge of the civil forfeiture rules," but, at the same time, stated that Cristal "admits" that a state prosecutor had "encouraged her to seek the advice of legal counsel." A-75. The district court held that Cristal's decision *not* to retain an attorney "was a matter 'within [her] reasonable control,'

which *weighs against* a finding of excusable neglect." *Id.* (citation omitted). This turned the court's proper treatment of a *pro se* litigant upside down.

This Court has instructed that district courts should be particularly hesitant to enter default judgment against *pro se* litigants. "[A]s a general rule a district court should grant a default judgment sparingly and grant leave to set aside the entry of default freely when the defaulting party is appearing *pro se*." *Enron Oil Corp.*, 10 F.3d at 96. After all, "[a] party appearing without counsel is afforded extra leeway in meeting the procedural rules governing litigation, and trial judges must make some effort to protect a party so appearing from waiving a right to be heard because of his or her lack of legal knowledge." *Id.*; *see also Traguth*, 710 F.2d at 95 (court must "make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training"). The court should have treated Cristal's *pro se* status as a compelling reason to forgive the missed deadline, not the opposite.

The district court cited *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003), for the proposition that Cristal's failure to hire a lawyer was a matter "within her reasonable control," A-75, but that case does not remotely support such a proposition. *Silivanch* did not involve a *pro se* plaintiff and, in fact, did not even involve a default judgment; the issue in that case was whether a corporate defendant should be forgiven for its attorney's failure to file a timely

36

notice of appeal. *See id.* at 358. The court stated that the "excusable neglect" standard focuses on "the reason for the delay, including whether it was within the reasonable control of the movant," *id.* at 366, but did not say anything that would remotely suggest that the Court intended to call into doubt the well-established rule that courts should attempt to ensure that cases involving *pro se* litigants are decided on the merits, rather than procedural technicalities.

The district court's reading of *Silivanch*, if accepted, would eviscerate the Court's precedents directing district courts to enter default judgments "sparingly" in cases involving *pro se* litigants. *Enron Oil Corp.*, 10 F.3d at 96. After all, virtually every *pro se* litigant would be well advised to hire an attorney. Thus, in nearly every case involving a *pro se* litigant, the decision not to hire an attorney and to instead proceed *pro se* could be seen as a mistake that fell within the litigant's "reasonable control." Nonetheless, whatever the reason for a litigant's *pro se* status, this Court has held that *pro se* litigants are "afforded extra leeway in meeting the procedural rules." *Id.* No case suggests that a district court can withdraw that "extra leeway" simply because the district court (or a government prosecutor) thinks the litigant would be better off with an attorney.

In any event, the district court was wrong to conclude that Cristal's *pro se* status was within her "reasonable control." Cristal's money was taken against her will. If she wanted to get it back, she had to go to court. Given the cost of hiring an

attorney, it was not financially sensible to hire an attorney to recover $8,040, even if she could afford to do so, and so she proceeded *pro se*. Nor is that uncommon; not every litigant can afford to hire an attorney, and many are forced to proceed *pro se* out of necessity—rather than choice. When a *pro se* litigant is forced into court "against her will," the "court's duty is even broader" to protect against accidental loss of the litigant's rights. *Traguth*, 710 F.2d at 95.

The fact is that it often makes little sense for property owners in civil forfeiture cases to hire an attorney, and, if innocent property owners cannot fight *pro se*, they will have little choice but to either give up entirely or enter into coercive settlement agreements on terms proposed by the government. *See* A-41 (recounting the government's offer in this case to settle for half the $8,040). To avoid trespassing on the property rights of innocent people, courts should take care to ensure that forfeiture cases are decided on the merits, rather than based on procedural missteps by *pro se* property owners.

B. *The district court failed to consider, and thus gave insufficient weight to, the lack of prejudice to the government.*

In addition to drawing the precisely wrong conclusion from Cristal's *pro se* status, the district court also failed to consider the lack of prejudice to the government from the out-of-time filing.

Courts hold that a lack of prejudice to the government is an important factor to consider when deciding whether to forgive the untimely filing of a claim in a

38

forfeiture case. The Seventh Circuit, for instance, reversed a district court's refusal

to allow an untimely claim as an abuse of discretion, where the district court

"failed to consider several essential factors such as the apparent lack of prejudice

to the government if an extension of time were granted" and, as a result, had

"failed to exercise its discretion." *$103,387.27*, 863 F.2d at 563. "[W]here the

putative claimants have placed the court and the government on notice of their

interest in the property and their intent to contest the forfeiture, courts will grant

extensions of time, recognizing both the good-faith effort put forth and the lack of

prejudice to the government under such circumstances." *Id.* at 562. Similarly, the

Eleventh Circuit found that a district court abused its discretion when it refused to

allow an untimely claim, given that the "government was on notice as to [the

claimants'] identities and that they were asserting their interest," with the result

that the "[p]rejudice to the government for allowing the extension [was] minimal,

if any." *United States v. $125,938.62*, 370 F.3d 1325, 1330 (11th Cir. 2004). And

the Sixth Circuit has likewise found that the government could not show prejudice

from an untimely claim, where the "government never explains how setting aside

default in this case would increase litigation costs to a greater degree than would

naturally occur in all cases of setting aside default." *$22,050.00*, 595 F.3d at 325.

Outside the forfeiture context, this Court has likewise recognized that

prejudice to the opposing party is a relevant consideration when considering

whether to enter a default judgment. *See, e.g.*, *Davis*, 713 F.2d at 916 (district court erred by failing to vacate default, where "plaintiff does not contend that he would be substantially prejudiced if the judgment were vacated"); *Meehan*, 652 F.2d at 277 (setting aside default judgment where non-defaulting party "neither claimed nor proved prejudice"); *Pecarsky*, 249 F.3d at 174 (setting aside default judgment in part because non-defaulting party could not "establish that they would be prejudiced now by our decision to vacate the default judgment"). The requirement that the non-defaulting party show some prejudice from the default makes sense, given that it "is well established that default judgments are disfavored" and given that "[a] clear preference exists for cases to be adjudicated on the merits." *Id.*

As noted above, *supra* p. 33, the government in this case did not even attempt to show that it was prejudiced. Nor could it have made any such showing. There is no question that the government was "on notice as to [Cristal's] identit[y] and that [she was] asserting [her] interest," *$125,938.62*, 370 F.3d at 1330, given that Cristal filed a claim to the $8,040 in the DEA's administrative forfeiture proceeding in order to trigger the filing of a judicial forfeiture complaint. Indeed, the government's Complaint specifically noted that "Cristal Starling filed a claim with DEA on January 15, 2021, to halt the administrative forfeiture proceedings against the defendant currency." A-9.

40

The delay in this case also was not long: Cristal's first letter appears on the docket on November 30, 2021, which was little more than three months after the clerk's entry of default (and over two months *before* the district court entered default judgment). *See* A-2. Moreover, the significance of that delay is further minimized by the fact that Cristal submitted her letter not long after Kendrick was acquitted, as the government frequently asks to stay civil forfeiture cases pending the resolution of related criminal proceedings. *See, e.g.*, *United States v. Leasehold Interests in 118 Ave. D, Apartment 2A*, 754 F. Supp. 282, 285 (E.D.N.Y. 1990) (granting government's motion to stay civil forfeiture action pending criminal proceedings and stating that "if a related criminal action is pending and the Government shows that good cause exists to stay the forfeiture proceeding, then the district court *must* grant a stay"). Forfeiture proceedings often wind on for months or years after the seizure of property; in Cristal's case, for instance, nearly *six months* had already elapsed since the seizure of her $8,040 by the time the government filed its judicial forfeiture complaint, and the government waited an additional *two months* after filing its complaint to send its notice of the filing to Cristal. A-7, 31. Given the *eight months* that elapsed between the seizure and the time the government notified Cristal of the forfeiture complaint, the government can hardly argue that it was prejudiced by Cristal's comparatively short delay in filing a claim in the forfeiture action.

41

Given the district court's failure to consider the lack of prejudice to the government, as well as the district court's determination that Cristal's *pro se* status should weigh *against* her in the analysis, the district court "failed to consider several essential factors" and thus "failed to exercise its discretion." *$103,387.27*, 863 F.2d at 563. Indeed, "where the government can show absolutely no prejudice by the granting of an extension of time," it is "an abuse of discretion to deny an extension of time to amend a claim of ownership, absent any countervailing factors." *Id.*; *see also Traguth*, 710 F.2d at 95 (holding that "[t]he district court also abused its discretion in failing to take into account [the Appellant's] *pro se* status" and reversing default judgment). The district court's decision should be reversed based on this error as well.

## III. Even under the "excusable neglect" standard, Cristal should have been allowed to proceed with her defense of the forfeiture action.

Finally, even imagining the "excusable neglect" standard did somehow apply to this case, the district court erred when it refused to allow Cristal to proceed to contest the merits of this forfeiture action.

Although the district court stated that a party claiming excusable neglect "will, in the ordinary course, lose," A-74, this Court has made clear that is not at all the case in the default judgment context. To the contrary, in cases where a party appears *after* a default judgment has been entered, and the "excusable neglect" standard therefore applies, this Court holds that "'excusable neglect' is to be

42

construed generously in the context of an attempt to vacate a default judgment." *Am. All. Ins. Co.*, 92 F.3d at 58. Although the district court cited another decision from this Court for the proposition that a party "will, in the ordinary course, lose" under the excusable neglect standard, that case involved the untimely filing of a notice of appeal and *not* a default judgment. *See Silivanch*, 333 F.3d at 358. Deadlines for notices of appeal are, as this Court knows, stricter than most other deadlines. *See id.* at 363–64 (explaining that appeal deadlines are "jurisdictional" and that court's ability to extend deadlines is "severely circumscribed"). The Court's decision in *Silivanch* therefore does not remotely undermine the Court's prior instruction that the "excusable neglect" standard should be "construed generously" in the default judgment context.[20]

Furthermore, although the district court applied a four-factor test to determine "excusable neglect," while ultimately limiting its analysis to just *one* of those four factors, *see* A-73, this Court's precedents indicate that the "excusable neglect" analysis in the default judgment context instead looks to the same three factors discussed *supra* pp. 31-34 in the context of "good cause" under Rule 55(c). *See Am. All. Ins. Co.*, 92 F.3d at 59; *Pecarsky*, 249 F.3d at 171. The district court

---

[20] Even in the context of an untimely appeal, the Ninth Circuit has noted its disagreement with the approach adopted in *Silivanch*, declining to erect any "rigid legal rule against late filings attributable to any particular type of negligence." *Pincay v. Andrews*, 389 F.3d 853, 860 (9th Cir. 2004). Given this disagreement, the Court certainly should not extend *Silivanch* beyond its original context.

took its four-factor analysis from the Supreme Court's decision in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993), but the Second Circuit has continued to apply a three-factor test for excusable neglect in default judgment cases even after *Pioneer*. *See Am. All. Ins. Co.*, 92 F.3d at 59 (three years after *Pioneer*); *Pecarsky*, 249 F.3d at 171 (eight years after *Pioneer*). Moreover, this Court's failure to apply the four-factor test from *Pioneer* in the default judgment context should not be surprising, as the Supreme Court's decision in *Pioneer* arose in a very different context—involving the filing of proofs of claim in bankruptcy proceedings—and thus does not obviously apply in default judgment cases.

Accordingly, to the extent that the "excusable neglect" standard somehow applied, the district court should have found excusable neglect for the very same reasons discussed *supra* pp. 31-34 in the context of the Rule 55(c) good cause standard. The two standards consider the same three factors, and, although the Rule 55(c) standard is more "lenient," even in cases where the "excusable neglect" standard applies that standard is "construed generously" where a default judgment is concerned. *Am. All. Ins. Co.*, 92 F.3d at 58. Regardless of the governing legal standard, then, the district court erred when it entered default judgment against Cristal Starling—a *pro se* litigant—when she appeared in the action and made clear that she wished to contest the forfeiture on the merits.

Finally, even imagining that the district court was somehow correct to apply the four-part *Pioneer* test for "excusable neglect" to this case, notwithstanding all of the above, the district court still would have erred:

**1.** The first *Pioneer* factor looks to the "danger of prejudice to the [non-movant]." *Pioneer*, 507 U.S. at 395. As explained above, *supra* pp. 33, 40-41, the government has not established any prejudice from the delay here. Despite claiming to apply the *Pioneer* test for "excusable neglect," the district court erroneously failed to give any weight to this lack of prejudice.

**2.** The second *Pioneer* factor looks to the length of the delay and its impact on the proceedings. *Pioneer*, 507 U.S. at 395. As explained above, *supra* p. 41, three months passed from the time the clerk entered default to the time Cristal first appeared on the docket. That delay was relatively short in the context of a civil forfeiture proceeding; nearly *eight months* had passed following the seizure when the government mailed Cristal notice of its complaint, and, after Cristal appeared, another two months passed before default judgment was entered. *See* A-1–2, 7, 26. Moreover, any impact from the delay was further minimized by the fact that, had Cristal filed a timely claim, the forfeiture action might well have been stayed regardless pending resolution of Kendrick's criminal case.

**3.** The third *Pioneer* factor looks to the reason for the delay. *Pioneer*, 507 U.S. at 395. Here, as explained *supra* pp. 35-38, the Court should have

45

assigned greater weight to the fact that Cristal was proceeding *pro se* and thus was not familiar with the rules and procedures for forfeiture cases. While the district court emphasized that the rules set clear deadlines, those deadlines are set by obscure "supplemental" rules of civil procedure that even many *lawyers* do not know exist. *See* Fed. R. Civ. P. Supp. R. G. A non-lawyer would naturally have difficulty navigating the civil forfeiture system. Cristal reasonably believed that the civil forfeiture action would not proceed until her ex-boyfreind's criminal proceeding had been resolved, and Cristal took action to seek the return of her property promptly after her ex-boyfriend was acquitted.

**4.** Finally, the fourth *Pioneer* factor looks to whether the movant acted in good faith. *Pioneer*, 507 U.S. at 395. As explained above, *supra* pp. 31-33, the record shows that Cristal acted in good faith to contest the forfeiture. Cristal filed an administrative claim. A-9. She spoke with the state prosecutors on Kendrick's case to try to get the money back. A-48, 59. She notified the Court when Kendrick was acquitted. A-40. She opposed the government's motion to strike. A-48. And she indicated at every turn that she "would like to move forward with court proceedings to have all of the funds returned." A-41. In other words, Cristal's "conduct and *pro se* correspondence evidences [her] intent to fulfill [her] obligations as a litigant." *See Enron Oil Corp.*, 10 F.3d at 97–98.

46

**IV.  These black letter procedural errors are particularly significant given concerns that arise when the government terminates property rights.**

The procedural errors detailed above require reversal of the decision below as a matter of black letter law, as the district court applied the wrong standard and failed to consider (or, worse, drew precisely the wrong inference from) important factors in the analysis. That conclusion is further strengthened, however, given the additional concerns that arise when the government terminates property rights using civil forfeiture.

As the Supreme Court has observed, the fact that law enforcement retains forfeiture proceeds creates a "financial stake in drug forfeiture," with the result that the government "has a direct pecuniary interest in the outcome of the proceeding." *James Daniel Good*, 510 U.S. at 55–56 & n.2. That "direct pecuniary interest" is significant, with the federal government taking in billions of dollars every year under the forfeiture laws. *See* POLICING FOR PROFIT, *supra*, at 16. Forfeiture revenues are deposited in a special fund, where they are available to fund the operations of the Department of Justice without any need for congressional appropriation. *See* ALTERNATIVE SOURCES OF FUNDING, *supra*, at 50–53.[21] Law

---

[21] Congress first allowed law enforcement agencies to profit directly from civil forfeitures in 1984, when it created the federal Asset Forfeiture Fund. *See* Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837. The introduction of this profit incentive fueled an extraordinary increase in the use of civil forfeiture, as annual deposits in the federal Asset Forfeiture Fund grew from $93.7 million in 1986 to $4.5 *billion* in 2014. *See* INSTITUTE FOR JUSTICE,

enforcement officials have openly acknowledged the importance of this profit

incentive; one law enforcement official, for instance, was caught on tape referring

to forfeited property as "little goodies." Shaila Dewan, *Police Use Department*

*Wish List When Deciding Which Assets to Seize*, N.Y. Times (Nov. 9, 2014).[22]

DEA also specifically mentions anticipated forfeiture revenues in its annual budget

submission to Congress. *See* U.S. DEP'T OF JUSTICE, DRUG ENFORCEMENT ADMIN.,

FY 2022 PERFORMANCE BUDGET CONGRESSIONAL BUDGET SUBMISSION, available

at https://perma.cc/65Z9-CWF9.

    That financial incentive heightens the importance of ensuring that property

owners do not unnecessarily lose their right to a hearing on the merits. As the

Supreme Court has observed, the "purpose of an adversary hearing is to ensure the

requisite neutrality that must inform all governmental decisionmaking," and that

"protection is of particular importance here, where the Government has a direct

pecuniary interest in the outcome of the proceeding." *James Daniel Good*, 510

U.S. at 55–56; *see also Harmelin v. Michigan*, 501 U.S. 957, 978, n. 9 (1991)

---

DICK M. CARPENTER II, *ET AL.*, POLICING FOR PROFIT: THE ABUSE OF CIVIL ASSET
FORFEITURE 5 (2d ed. Nov. 2015), available at https://bit.ly/3rKTG0Z. The most
recent edition of POLICING FOR PROFIT, meanwhile, shows that federal agencies
have continued to make billions of dollars in annual forfeiture deposits in more
recent years. *See* POLICING FOR PROFIT, *supra*, at 16.

  [22] Available at https://nyti.ms/2Bkntb6. The same article reported that a
government attorney in New Jersey admitted that he is more likely to pursue
forfeiture if the property would be useful to law enforcement: "If you want the car,
and you really want to put it in your fleet, let me know—I'll fight for it." *Id.*

(opinion of Scalia, J.) ("[I]t makes sense to scrutinize governmental action more closely when the State stands to benefit."). Moreover, even apart from the financial incentive, the termination of property rights is a "drastic" remedy, leading the Supreme Court to observe that "[f]orfeitures are not favored" and "should be enforced only when within both letter and spirit of the law." *United States v. One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939). In other words, the Court should take particular care to uphold the rights of property owners in the civil forfeiture context.

Moreover, these concerns are heightened further given the procedural complexity of the forfeiture laws, as well as the likelihood that property owners will proceed *pro se*. After all, the civil forfeiture laws raise significant hurdles for a property owner in Cristal's position. Property owners must make numerous filings—including two separate filings, both denominated a "claim"—just to avoid losing by default. *See* 18 U.S.C. § 983; Fed. R. Civ. P. Supp. R. G. Where property is seized by local police and transferred to the federal government, property owners must navigate the distinction between the state and federal systems. Property owners also must often wait a long time, potentially months or years, for their day in court, and must remain attentive to the proceedings throughout to ensure they do not miss a deadline. And when the amount of money is small, as it is here, it is

49

prohibitively expensive to hire an attorney. Many property owners give up, either walking away or entering coercive settlements.

When property owners instead decide to fight—and do so *pro se*—courts should do their best to ensure that the case is decided on the merits, rather than procedural technicalities. To be sure, deadlines are part of litigation, but even *outside* the civil forfeiture context this Court has explained that there is a "strong polic[y] favoring the resolution of genuine disputes on their merits," *Traguth*, 710 F.2d at 94, with the result that "defaults are generally disfavored," *Enron Oil Corp.*, 10 F.3d at 96. Moreover, "as a general rule a district court should grant a default judgment sparingly and grant leave to set aside the entry of default freely when the defaulting party is appearing *pro se*." *Id.* The Court need only apply these black letter procedural rules to reverse the decision below. And these black letter rules, in turn, assume particular importance given the special concerns that apply in the civil forfeiture context.

## CONCLUSION

The decision below should be reversed with instructions that Cristal should be allowed to proceed to the merits.

Dated: June 30, 2022     Respectfully submitted,

                /s/ Robert E. Johnson

               Robert E. Johnson
               INSTITUTE FOR JUSTICE
               16781 Chagrin Blvd. #256
               Shaker Heights, OH 44120
               P. (703) 682-9320
               F. (703) 682-9321
               E. rjohnson@ij.org

               Seth M. Young
               INSTITUTE FOR JUSTICE
               901 N. Glebe Road, Suite 900
               Arlington, VA 22203
               P. (703) 682-9320
               F. (703) 682-9321
               E. syoung@ij.org

               *Counsel for Claimant-Appellant*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [*12,887*] words.

    [   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.  This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

    [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: June 30, 2022                    /s/ Robert E. Johnson
                                        *Counsel for Claimant-Appellant*

52

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 30th day of June, 2022, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to all registered

CM/ECF users.

/s/ Robert E. Johnson
*Counsel for Claimant-Appellant*