22-659
U.S. v. Starling

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————————

August Term, 2022
Argued: May 3, 2023
Decided: August 4, 2023

No. 22-659

—————————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

CRISTAL STARLING,
*Claimant-Appellant*,

$8,040.00 UNITED STATES CURRENCY,
*Defendant*.

—————————————

Before: KEARSE, JACOBS, and MENASHI, *Circuit Judges*.

Police officers seized just over $8,000 in a search of Cristal Starling's home

carried out as part of a drug trafficking investigation into her then-boyfriend,

K.B.   The local police turned over the funds to the U.S. Drug Enforcement

Administration, which initiated an administrative forfeiture procedure to claim

CERTIFIED COPY ISSUED ON 08/04/2023

the funds as proceeds from drug sales.   Acting pro se, Starling filed a claim to

the assets, forcing the government to terminate its administrative seizure and

open a judicial forfeiture proceeding in the U.S. District Court for the Western

District of New York.   She failed to timely oppose the ensuing judicial

proceeding, and the clerk of court entered default against the funds.

Starling, still acting pro se, then sent several letters to the district court and

the U.S. Attorney's Office seeking leave to file a belated claim to the seized

assets.   The district court (Siragusa, *J.*) held that Starling had not shown

excusable neglect, denied her an extension of time to file a claim, and entered

final default judgment against the seized assets.

We hold that the district court erred in granting default judgment to the

government.   Starling's letters are properly viewed as seeking both to lift the

entry of default and to be granted leave to file an untimely claim to the assets.

So understood, Starling's motion should have been assessed under the more

permissive good cause standard, as is any other motion to lift entry of default in

a civil suit.

We therefore **VACATE** the grant of the motion to strike and the entry of default judgment, and **REMAND** for further proceedings consistent with this opinion.

_____

ROBERT E. JOHNSON (Seth M. Young, *on the brief*), Institute for Justice, Shaker Heights, OH, *for Claimant-Appellant*.

MICHAEL A. ROTKER (Kenneth A. Polite, Jr., Assistant Attorney General, and Lisa H. Miller, Deputy Assistant Attorney General, *on the brief*), United States Department of Justice, Criminal Division, Washington, DC, *for Plaintiff-Appellee*.

Grace M. Carducci, Assistant United States Attorney, *for* Trini E. Ross, United States Attorney for the Western District of New York, Buffalo, N.Y., *for Plaintiff-Appellee*.

DENNIS JACOBS, *Circuit Judge*:

Police officers seized just over $8,000 in a search of Cristal Starling's home carried out as part of a drug trafficking investigation into her then-boyfriend, K.B.[1]   The local police turned over the funds to the U.S. Drug Enforcement

_____

[1] Because he was apparently acquitted of all charges and his state court records are sealed, <u>see</u> N.Y. Crim. Proc. Law § 160.50, his name is omitted from this opinion.

3

Administration, which initiated an administrative forfeiture procedure to claim

the funds as proceeds from drug sales. Acting pro se, Starling filed a claim to

the assets, forcing the government to terminate its administrative seizure and

open a judicial forfeiture proceeding in the U.S. District Court for the Western

District of New York.

As required, the government provided notice of the forfeiture proceeding

on its website and by mail sent directly to Starling. She claims to have missed

the notice, and after months went by without response to the judicial forfeiture

action, the U.S. Attorney's Office for the Western District of New York moved for

entry of default against the seized currency. The clerk of court entered default.

Starling, still acting pro se, then sent several letters to the district court and

the U.S. Attorney's Office seeking leave to file a belated claim to the seized

assets. The district court (Siragusa, *J.*) held that Starling had not shown

excusable neglect, denied her an extension of time to file a claim, and entered

default judgment against the seized assets.

On appeal, Starling argues principally that the district court erred by

assessing her letters under the strict "excusable neglect" standard set out under

Federal Rule of Civil Procedure 6, rather than the more permissive "good cause"

4

standard that typically applies when a party seeks to lift entry of default before default judgment has been granted.

We vacate the default judgment. The district court read Starling's pro se letters too narrowly as a motion to file an untimely claim, ignoring Starling's request to lift the entry of default. Viewed properly as a motion seeking both forms of relief, we hold that the good cause standard applies and is satisfied.

**I**

After K.B. allegedly sold drugs to undercover officers as part of a state investigation into cocaine and fentanyl trafficking, police executed a warrant to search Starling's apartment on West Main Street in Rochester, New York. There they seized "$7,500 United States Currency from the top dresser drawer of the master bedroom, [and] $540 United States Currency from the pants pocket of a pair of women's jeans that were laying on the floor in the hallway adjacent to the master bedroom." J.A. 7. Also found with the cash were two digital scales, ten strips of Suboxone (a prescription agonist/antagonist drug used to treat opioid addiction), and mail addressed to K.B. Substantial quantities of drugs were allegedly found at a different residence the government believed was connected to K.B., but not in Starling's West Main Street residence. K.B. was arrested and

charged with state drug possession offenses, and local authorities turned over the seized funds to the U.S. Drug Enforcement Administration (DEA) to begin an administrative forfeiture proceeding.

Starling, acting pro se, filed a remission petition and an administrative claim against the seized funds pursuant to the DEA's internal procedures. By operation of law, see 18 U.S.C. § 983(a)(2)(A), (3)(A), Starling's claim terminated the DEA's administrative forfeiture proceedings and required the government to initiate a judicial forfeiture action in the appropriate federal district court—in this case, the U.S. District Court for the Western District of New York.

The U.S. Attorney's Office for the Western District of New York filed a complaint against the seized funds in April 2021, alleging that they were proceeds of K.B.'s drug trafficking. The complaint acknowledged that Starling was interested in the seizure and had earlier filed a claim with the DEA. Consistent with its obligations under Supplemental Rule G to the Federal Rules of Civil Procedure, which governs civil forfeiture actions, the government provided notice of the action by posting on the government's forfeiture website for 30 days. It also sent, by Federal Express, a notice and copy of the complaint

6

to Starling in June 2021.[2]   The notice required Starling to file a claim to the assets by July 16, 2021 (32 days after the notice was sent).   Starling later explained that she did not receive the FedEx mailing because she "was vacationing in Las Vegas" at the time, J.A. 58, although it is uncontested that the documents were successfully delivered to the West Main Street apartment.

In August, having heard nothing from Starling and no challenge to the forfeiture proceeding, the government moved for, and was granted, an entry of default.   It moved for default judgment ten days later.

Roughly three months later, and before the government's motion for default judgment had been granted, Starling sent the first of four undated letters to the U.S. Attorney's Office and the district court.   Still acting pro se, Starling stated that the West Main Street apartment was her residence and that she was seeking return of the seized funds because K.B. had been acquitted.   Id. at 40. At this point, the government apparently contacted Starling and offered to settle

---

[2]  The government need not provide formal service of process in a civil forfeiture proceeding; it must only give notice "to any person who reasonably appears to be a potential claimant on the facts known to the government," and it may do so by any "means reasonably calculated to reach the potential claimant." Supp. R. G(4)(b)(i), (iii)(A).

the forfeiture action by splitting the funds, half to Starling and half for itself. Starling rejected the offer in a second letter, received by the district court a few days later, which declared that she "would like to move forward with court proceedings to have all of the funds returned to [her] promptly." Id. at 41.

The government moved to strike her letters as an untimely claim to the assets, arguing that because she was "given direct notice of this action on June 14, 2021, Starling's claim was due on July 16, 2021." Id. at 44 (emphasis omitted). Starling responded that her untimely claim should be allowed by the district court because she (i) had challenged the prior administrative proceeding, and (ii) "contacted and followed the advice of the district attorney presiding over the case that resulted in these monies being confiscated." Id. at 48. The government responded with affidavits from the two assistant district attorneys who handled K.B.'s prosecution; one asserted that he had never communicated with Starling, but the other, Eleanor Biggers, made the (non-disprovable) assertion that she "d[id] not recall ever communicating with" Starling. Id. at 49–56. Starling replied by offering a description and documents evidencing two conversations she allegedly had with Biggers concerning cars that were also seized in the search (but ultimately returned to Starling).

8

The district court interpreted Starling's first and second letters as a claim to the defendant assets in the judicial forfeiture proceedings, and the third and fourth letters as an opposition and surreply to the government's motion to strike. It took note of this Court's holding in United States v. Cambio Exacto, S.A., that "[i]n order to contest a governmental forfeiture action, claimants must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution." Id. at 71 (quoting 166 F.3d 522, 526 (2d Cir. 1999)). Reasoning that this "[s]tatutory standing relates to a claimant's ability to demonstrate compliance with the statutory and procedural requirements imposed by Congress," the court held that Starling lacked statutory standing to oppose the forfeiture because she had failed to file a timely claim as required by Supplemental Rule G to the Federal Rules of Civil Procedure. Id. at 71–74, 76.

The district court also considered whether Starling should be permitted to file a claim against the funds nunc pro tunc. It considered this question in terms of "excusable neglect" and, applying this standard, it rejected the excuses Starling offered for her untimely claim, including that she (i) did not receive the FedEx notice, (ii) did not understand that she needed to separately challenge the judicial proceeding after challenging the administrative one, and (iii) had been

9

informed by ADA Biggers that she could not challenge the forfeiture until the criminal case completed.   The advice that Starling attributes to Biggers is a generally accurate statement of the law in New York state proceedings, where a forfeiture connected to a drug prosecution is stayed until the associated criminal case is completed.   See N.Y. C.P.L.R. § 1311(1)(b) ("An action under this paragraph shall be stayed during the pendency of a criminal action which is related to it.").   Assuming the conversation Starling alleges indeed took place, and given the fact that state—not federal—law enforcement officers initially seized the funds, the apparent confusion is understandable.

Having rejected as untimely the only claim filed against the defendant assets, the district court entered default judgment in favor of the United States. Starling now appeals.   She argues principally that the district court erred by assessing her letters under the excusable neglect standard, rather than under the more permissive good cause standard.

## II

Under Rule 55, default judgment begins with a motion by a party demonstrating that the non-movant has "failed to plead or otherwise defend." Fed. R. Civ. P. 55(a).   Once that motion is granted, the clerk of court enters a

10

default.  Id.   After default has been entered, the movant must apply for the entry of default *judgment*—a final adjudication of the claims—which process may entail factfinding or hearings by the district court to establish remedies or quantum.   Fed. R. Civ. P. 55(b); see also, e.g., Meehan v. Snow, 652 F.2d 274, 276 (2d Cir. 1981) (per curiam).

Rule 55 sets out alternative standards that a defaulting party must satisfy in order to resist this process.   If the missing party appears when the clerk of court has entered default but before final judgment has been entered, the district court "may set aside" the entry of default "for good cause."   Fed. R. Civ. P. 55(c). But if final judgment has already been entered, the delinquent party must attack the judgment under the exacting standards of Rule 60(b) by showing, among other things, excusable neglect.   Id.; see Fed. R. Civ. P. 60(b)(1).   Entry of default therefore operates as a final warning before the absent party suffers the hard consequences of a judgment.

Because Starling submitted her letters to the court before final judgment was entered, she asks that her challenge be construed, like any other to an entry of default, under the permissive "good cause" standard.

11

The government reads the Rules differently. Under Supplemental Rule G(5)(a), a party given direct notice of a forfeiture complaint must contest the complaint by filing a claim to the assets before the deadline specified in the direct notice. Supp. R. G(5)(a). Because Starling failed to file a claim within the 32 days specified in the notice, the government argues, she is subject to Federal Rule 6's general principle that "[w]hen an act may or must be done within a specified time," and "the time has expired," the court may extend the deadline only "if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1). (It does not appear that the government holds itself to the scrupulous punctuality that it demands of a <u>pro se</u> litigant.[3])

_____

[3] Supplemental Rule G requires that the government fix the deadline for filing a responsive claim "at least 35 days after the notice is *sent*." Supp. R. G(4)(b)(ii)(B) (emphasis added). The government's notice of the forfeiture action was *signed* on June 11, 2021, J.A. 34, but by its own contention was not *sent* until three days later, on June 14, 2021, <u>id.</u> at 37. If the government's dates are accurate, then it was wrong to set any deadline for a responsive filing earlier than July 19, 2021, and the notice sent to Starling failed to comply with Supplemental Rule G by setting a deadline of July 16, 2021. This innocuous mistake merits indulgence, especially when it appears to have had no impact on Starling's default. Still, it raises an eyebrow that the government demands that Starling's claim be stricken for lack of "[s]trict compliance with [the rules]." Br. of United States at 19–20 (quoting <u>United States v. Amiel</u>, 995 F.2d 367, 371 (2d Cir. 1993)) (second alteration in original).

12

### III

The question in this appeal is whether the district court was required to use the "good cause" standard generally applicable to default under Federal Rule of Civil Procedure 55(c), or to enforce, under Federal Rule 6's "excusable neglect" standard, the strict requirements of the forfeiture-specific Supplemental Rule G.

### A

Ascertaining the appropriate standard by which to assess Starling's letters depends first on identifying the relief her letters sought.   At the time Starling wrote to the district court and the U.S. Attorney's Office, she was acting pro se. Parties have a right to self-representation, and "[i]mplicit" in this right "is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training."   Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983).   "While the right 'does not exempt a party from compliance with relevant rules of procedural and substantive law,' it should not be impaired by harsh application of technical rules."   Id. (quoting Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981)).   District courts are therefore "directed to read pro se papers liberally."   Id.   Because a

13

default judgment may lead a pro se party's entire case to founder on mistake or ignorance, a court's discretion to grant default judgment is "circumscribed" as "a reflection of our oft-stated preference for resolving disputes on the merits." Enron Oil Corp. v. Daikuhara, 10 F.3d 90, 95 (2d Cir. 1993). To protect a pro se litigant's rights, therefore, we may be called upon to reverse a district court's entry of default judgment, a decision ordinarily "left to the sound discretion of a district court," even in cases where the abuse of discretion "was not glaring." Id.

Starling initially challenged the civil forfeiture proceeding by two letters she submitted to the U.S. Attorney's Office and the district court. The first stated that she was "writing to notify the courts that the defendant of the case stemming from the warrant execution, [K.B.], was recently acquitted of all charges," and that she had "been advised to contact this office to have a motion filed on the docket to have [her] money be released and returned to [her]." J.A. 40. Her second letter stated that, rather than accept a settlement, she "would like to move forward with court proceedings to have all of the funds returned to [her] promptly," that "this money being taken" had "caused a hardship for [her]" as "a single woman raising a medically fragile child with no outside

14

support," and that she believed that "due to all charges being thrown out and legal proceedings ceased, any property confiscated during the legal process should be returned to its rightful owner." <u>Id.</u> at 41.

The district court deemed these letters to be an untimely motion to file "a claim on the defendant currency." <u>Id.</u> at 67. This was true enough—the letters plainly communicate a claim to the seized funds. But they also communicate a desire to "move forward with court proceedings to have all of the funds returned." <u>Id.</u> at 41. This is the plea of any tardy litigant trying to lift entry of default: She was ready to litigate and wanted to win. The district court was required to heed that message. <u>See</u> <u>Traguth</u>, 710 F.2d at 94–95. Even if Starling had not clearly expressed a desire to press on with the litigation, the letters cannot be read as limited to a motion for leave to file an untimely claim. Once the entry of default was on the docket, final default judgment could be granted no matter what claims she sought to file. Construing the letter solely as a motion for late filing of her claim—without also viewing it as a motion to lift the default—means reading it as a motion for which no relief could be granted. This was error. <u>See</u> <u>Meehan</u>, 652 F.2d at 276.

15

**B**

Starling's letters are therefore properly viewed as a dual motion, seeking both to lift the entry of default—ordinarily governed by the "good cause" standard of Rule 55(c)—and to file a claim against the seized funds—ordinarily governed by the "excusable neglect" standard of Rule 6.   Supplemental Rule G does not specify which standard should prevail, and it is a question of first impression for this Court.

As the Sixth Circuit recognized when faced with the same question, there are "materially different standards in determining whether to excuse noncompliance or to adhere strictly to the rules."   United States v. $22,050.00 U.S. Currency, 595 F.3d 318, 322 (6th Cir. 2010).   On one hand, courts addressing "motions to set aside default under Rule 55(c) are extremely forgiving to the defaulting party and favor a policy of resolving cases on the merits instead of on the basis of procedural missteps."   Id.; see also, e.g., Meehan, 652 F.2d at 277 ("While courts are entitled to enforce compliance with the time limits of the Rules by various means, the extreme sanction of a default judgment must remain a weapon of last, rather than first, resort.").   In contrast, "cases discussing motions to strike claims under Supplemental Rule G favor strict adherence to the

16

rules and generally do not excuse even technical non-compliance with the rules." $22,050.00 U.S. Currency, 595 F.3d at 322; see also, e.g., United States v. Vazquez-Alvarez, 760 F.3d 193, 197 (2d Cir. 2014) (per curiam) (requiring strict adherence to the procedural order dictated by Rule G).

The government asserts that Rule 6's excusable neglect standard must apply because the rule "sets out procedural prerequisites and substantive standards for granting an extension of time depending on when the request [for an extension] was made."  Br. of the United States at 32.  To consider untimely claims under the permissive good cause standard would, in its view, "attach no consequence to a litigant's failure to request additional time in a timely manner." Id. at 34.  This is mistaken.

The text of Supplemental Rule G suggests that good cause is the appropriate standard.  The rule sets deadlines for when a claim to the defendant assets "must be filed . . . [u]nless the court *for good cause* sets a different time." Supp. R. G(5)(a)(ii) (emphasis added).  It gives no indication that a harsher standard should govern a later motion.  And applying the standard to defaulting claimants would mirror the government's burden when it seeks an extension of time to convert an administrative forfeiture proceeding into a

17

judicial one.   See 18 U.S.C. § 983(a)(3)(A) ("[A] court . . . may extend the period for filing a complaint for good cause shown or upon agreement of the parties.").

The government's argument misapprehends how Rule 6 and Rule 55 operate in the case of default.   By definition, default may be entered only when a defendant has "failed to plead or otherwise defend."   Fed. R. Civ. P. 55(a).   Of course, a party cannot have failed to plead or defend when the deadline for pleading or defending has not yet passed.   It cannot be that a single missed deadline is enough to displace the good cause standard of Rule 55 with the excusable neglect standard of Rule 6; if it were, there would never be a party able to lift default under the lenient standard.   This is not what the Rules, or our cases, contemplate.   See, e.g., Meehan, 652 F.2d at 275–77 (district court erred by failing to apply Rule 55(c) standard when defendant had missed the deadline to file an answer by ten days).   The government's argument to the contrary is defective.[4]

---

[4] The government understands a denial of Starling's motion to flow naturally from this Court's rule, set out in Cambio Exacto, that "[t]o establish statutory standing, a claimant asserting rights in property that has been seized and that is the subject of a forfeiture action in rem must file a verified claim within [the required number of] days after process has been executed, unless the

The Federal Rules of Civil Procedure are not supplanted unless they are in conflict with a provision of the supplemental rules.    <u>Amiel</u>, 995 F.2d at 371. Nothing about Supplemental Rule G conflicts with the typical rule—set out in Rule 55—that good cause applies when a party seeks to lift an entry of default. And for the reasons explained above, the timeliness <u>vel non</u> of a claim cannot be sufficient, standing alone, to displace Rule 55.

Like the Sixth Circuit, we do not perceive "anything functionally different about civil forfeiture cases that compels us to treat untimely response in these

---

court grants an extension."    166 F.3d at 526 (citing Supplemental Rules for Certain Admiralty and Maritime Claims, Rule C(6)).    But this was no obstacle to Starling's motion.    Even in <u>Cambio Exacto</u> we recognized that an untimely plaintiff lacks statutory standing "*unless the court grants an extension,*" and our cases have made clear that a <u>nunc pro tunc</u> filing is possible.    <u>Id.</u> (emphasis added); <u>see also, e.g.</u>, <u>United States v. $417,143.48 U.S. Currency</u>, 682 F. App'x 17, 19 (2d Cir. 2017) (summary order) (illustrating that claimants who lack statutory standing could be granted leave to file claims <u>nunc pro tunc</u>).    What we have described as "statutory standing" operates as an obstacle only to dispositive motions which follow from establishing the initial claim.    For example, a party must first establish that he is a claimant to the seized assets before he can move to dismiss the forfeiture action.    <u>See</u> <u>Vazquez-Alvarez</u>, 760 F.3d at 197.    We note that "statutory standing" does not implicate our jurisdiction, but the term is a "misleading" shorthand for asking "whether [a litigant] has a cause of action under the [relevant] statute."    <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 128 & n.4 (2014)

cases differently than untimely responses in all other civil cases." $22,050.00
U.S. Currency, 595 F.3d at 323.   To the contrary, civil forfeiture procedure
magnifies the importance of deciding such cases on the merits rather than by
default.   Civil forfeiture can "enable the government to seize . . . property
without any predeprivation judicial process and to obtain forfeiture of the
property even when the owner is personally innocent." Leonard v. Texas, 580
U.S. 1178, 1179 (2017) (statement of Thomas, *J.*, respecting denial of certiorari).
As was made clear in this case, the lax notice requirements allow the government
to start the clock toward default judgment with perfunctory measures, such as
ordinary mail, and by posting on a government forfeiture website that the
citizenry has no reason to know of.   See Supp. R. G(4).   And because the typical
forfeiture case concerns cash and goods with consequence to the deprived party
but which rarely justify hiring a lawyer, a huge number of civil forfeiture cases
are fought by claimants acting pro se.   See Louis S. Rulli, Prosecuting Civil Asset
Forfeiture on Contingency Fees: Looking for Profit in All the Wrong Places, 72
Ala. L. Rev. 531, 535 (2021) (observing that "civil forfeiture laws do not provide a
right to counsel for the poor" and that "the government's seizure of modest
amounts of cash and vehicles often make it economically infeasible to hire a

20

lawyer"). All this is driven by incentive: The authorities can pocket what they can seize by forfeit.[5] Id. at 534, 546–48 ("Between 2001 and 2014, deposits in the U.S. Department of Justice and Treasury forfeiture accounts totaled almost $29 billion.").

Each of these reasons alone would be enough to compel trial courts to consider untimely claims with particular indulgence. We therefore hold that when, as in this case, a claimant with Article III standing seeks to file an untimely claim against seized assets after default has been entered but before default judgment has been granted, district courts should apply the "good cause" standard.

––––––––––––––––––––

[5] In eighteenth-century France, many imposts—the most hated being the gabelle and the octroi—were collected by tax farmers who kept a share of what they could take, to fantastic personal benefit. Eugene N. White, From Privatized to Government-Administered Tax Collection: Tax Farming in Eighteenth-Century France, 57 Econ. Hist. Rev. 636, 645–48 (2004); Yves Durand, Finance et mécénat: Les Fermiers généraux au XVIIIe siècle 14–16, 61–65, 190–91 (1976). The abuse of the fermiers généraux was a spark that lit the French Revolution. See Jean Clinquart, Les services extérieurs de la Ferme générale à la fin de l'Ancien Régime 239–44 (1995) (describing the ventilation of popular anger toward the Ferme in the summer of 1789); Durand, supra, 195–99 ("[L]es cahiers de doléances pour les Etats [généraux] de 1789 contiennent de très nombreuses allusions aux financiers et à la Ferme. . . . On enregistre partout la condamnation du système d'impôts, de la Ferme et des fermiers généraux.").

**IV**

Applying the good cause standard, we conclude that the district court should have lifted the entry of default and permitted Starling to file her claim to the assets. The district court assessed Starling's motion under the excusable neglect standard, which considers "the danger of prejudice to the nonmovant, the length of the delay and its impact on proceedings, the reason for the delay including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." J.A. 73 (quoting United States v. $541,395.06 U.S. Currency, No. 10-CV-6555, 2012 WL 3614294, at *3 (W.D.N.Y. Aug. 21, 2012)). In contrast, the good cause standard considers three factors: (i) the willfulness of the defaulting party, (ii) prejudice to the non-movant, and (iii) whether the defaulting party has a meritorious defense. Meehan, 652 F.2d at 277. While excusable neglect penalizes negligent parties for failing to prosecute their cases, the good cause standard attaches consequences only to bad faith or tactical violations of court orders. See, e.g., Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 507 (2d Cir. 1991) (default would not be vacated where movant "admit[ted] he deliberately chose not to appear in the action").

22

The good cause factors overwhelmingly favor Starling.   Willfulness in the default judgment context looks to "egregious or deliberate conduct," and even "grossly negligent" actions do not necessarily qualify.   Am. All. Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57, 61 (2d Cir. 1996) ("We see no reason to expand this Court's willfulness standard to include careless or negligent errors in the default judgment context.").   The government does not suggest Starling was acting in bad faith; at worst, she was negligent in prosecuting her claim, having relied on advice from a state prosecutor—sound as to New York forfeiture law—that she could not make a claim until K.B. was acquitted.   As to prejudice, the government has made no effort to show its interests would be harmed by having to defend a forfeiture suit against a claimant it knew of from the beginning.   See Meehan, 652 F.2d at 277 (good cause satisfied where, among other things, "[t]he appellees neither claimed nor proved prejudice"); United States v. $103,387.27 U.S. Currency, 863 F.2d 555, 562 (7th Cir. 1988) ("[W]here the putative claimants have placed the court and the government on notice of their interest in the property and their intent to contest the forfeiture, courts will grant extensions of time, recognizing both the good-faith effort put forth and the lack of prejudice to the government under such circumstances.").

23

As to the existence of a meritorious defense, Starling was never charged with a crime, let alone convicted. She should have the opportunity to show that she was an innocent owner. See 18 U.S.C. § 983(d)(1) ("An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."); see also United States v. $185,336.07 U.S. Currency, 731 F.3d 189, 197–98 (2d Cir. 2013) (reversing forfeiture judgment because of "the weakness of the government's case" to establish that all of the defendant funds were connected to drug sales).

Because each factor weighs in Starling's favor, we hold that she has demonstrated the good cause necessary to lift entry of default and file a belated claim to the defendant assets.

## CONCLUSION

For these reasons we **VACATE** the grant of the motion to strike and the entry of default judgment, and **REMAND** for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit